T.C. Memo. 1998-404


UNITED STATES TAX COURT


SHIGENORI KUDO AND MOTOMI KUDO, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10667-94, 19180-94,     Filed November 12, 1998.
            19181-94,   466-95,
              467-95.


<u>John Gigounas</u> and <u>Edward B. Simpson</u>, for petitioners.

<u>Allan D. Hill</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, <u>Judge</u>:  Respondent determined deficiencies in, and

additions to, petitioners' Federal income taxes as follows:

_____

[1] Cases of the following petitioners are consolidated
herewith:  Toraya Corporation, docket No. 19181-94; Yoshinori
Takao and Estate of Akiko Takao, Deceased, Yoshinori Takao,
Successor-in-interest, docket Nos. 466-95 and 467-95.

Shigenori Kudo and Motomi Kudo
(docket Nos. 10667-94 and 19180-94)

| Year | Deficiency | Additions to Tax Sec. 6662(a) |
|---|---|---|
| 1990 | $24,000 | $4,800 |
| 1991 | 24,030 | 4,806 |

Yoshinori Takao and Estate of Akiko Takao, Deceased,
Yoshinori Takao, Successor-in-Interest
(docket Nos. 466-95 and 467-95)

| Year | Deficiency | Additions to Tax | | | |
|---|---|---|---|---|---|
| | | Sec. 6651(a) | Sec. 6653(a)(1) | Sec. 6661 | Sec. 6662(a) |
| 1988 | $125,463 | $31,366 | $6,273 | $31,366 | -- |
| 1989 | 121,412 | -- | -- | -- | $24,282 |
| 1990 | 112,209 | -- | -- | -- | 22,442 |
| 1991 | 100,859 | -- | -- | -- | 20,172 |

Toraya Corporation
(docket No. 19181-94)

| Year | Deficiency | Additions to Tax | | | |
|---|---|---|---|---|---|
| | | Sec. 6651(a) | Sec. 6653(a)(1) | Sec. 6661 | Sec. 6662(a) |
| 1988 | $98,038 | $24,510 | $4,902 | $24,510 | -- |
| 1989 | 64,474 | 16,119 | -- | -- | $12,895 |
| 1990 | 47,885 | -- | -- | -- | 9,577 |
| 1991 | 24,060 | -- | -- | -- | 4,812 |

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

The issues for decision are set forth below.

Shigenori Kudo and Motomi Kudo
(docket Nos. 10667-94 and 19180-94)

After concessions,[2] the following issues remain in dispute:

(1)  Whether petitioners Shigenori Kudo (Scott) and Motomi Kudo (Motomi) (hereinafter collectively referred to as the Kudos) received unreported income in the amounts of $55,979 and $57,795 for 1990 and 1991, respectively, as shown by unexplained bank deposits made by them during those years.  We hold that they received unreported income in the amounts decided herein.

(2)  Whether the Kudos are liable for accuracy-related penalties for negligence under section 6662(a) for 1990 and 1991. We hold that they are.

Yoshinori Takao and Estate of Akiko Takao, Deceased,
Yoshinori Takao, Successor-in-Interest
(docket Nos. 466-95 and 467-95)

---

[2]  The parties settled some of the adjustments determined in the notices of deficiency dated Mar. 21, 1994, and July 19, 1994, as follows:

1.  The Kudos agree that the adjustments entitled "Rec'd from Toraya Corp. & Rest." are correct to the extent of $25,230 in 1990 and $24,000 in 1991.

2.  Respondent agrees that the Kudos are entitled to additional Schedule A deductions for 1990 and 1991 in the amounts of $21,249 and $17,634, respectively.

3.  Respondent concedes the adjustment for 1991 entitled "Taxes Paid by Employer" in the amount of $9,214.

4.  The Kudos concede that the adjustment for "Taxes Paid by Employer" for 1990 should be $6,942.

5.  Respondent concedes that the adjustment entitled "Unexplained Deposits" for 1990 in the amount of $55,979 should be reduced to $42,506.

6.  Respondent concedes that the adjustment entitled "Unexplained Deposits" for 1991 in the amount of $57,795 should be reduced to $53,011, by $652 representing an insurance payment and $4,132 representing refunds of State and Federal taxes.

After concessions,[3] the following issues remain in dispute:

---

[3] The parties have settled some of the adjustments as follows:

1. Respondent concedes that the adjustments for "Unexplained Deposits" 1988 and 1989 should be reduced by $13,837 and $6,238, respectively.

2. The Takaos agree that $10,108 of the $81,933 adjustment for "Unexplained Deposits" for 1991 attributable to deposits to the Industrial Bank of Japan and to the Chou Trust and Banking Co. is taxable income not reported on their 1991 return.

3. Respondent concedes the adjustments for "Dividend Income" should be decreased as follows:

| | |
|---|---|
| 1988 | $109,849 |
| 1989 | 85,888 |
| 1990 | 106,664 |
| 1991 | 84,855 |

The Takaos concede the remaining amounts under this adjustment, which are $1,000 for each year in issue.

4. Respondent concedes the adjustments entitled "Purchase Expenses" for all the years in issue.

5. Respondent and the Takaos agree that adjustments for "Advertising Expenses--Schedule C" for 1990 and 1991 are settled by reducing the amounts by $2,531 and $1,274, respectively.

6. Respondent and the Takaos agree that adjustments for "Car and Truck Expenses--Schedule C" are settled by reducing the amounts as follows:

| | |
|---|---|
| 1988 | $3,523 |
| 1989 | 4,000 |
| 1990 | 4,010 |
| 1991 | 3,936 |

In the stipulation of settled issues the years are shown as 1988, 1990, 1991, and 1992. We assume the years should have been shown as above inasmuch as 1992 is not involved in the instant case. Should our assumption be erroneous, the parties should calculate the adjustments for "Car and Truck Expenses--Schedule C" in the Rule 155 computations in the manner necessary to comport with the agreement of the parties.

7. Respondent concedes adjustments for "Depreciation Expenses--Schedule C" for all years in issue.

8. Respondent concedes adjustment entitled "Repairs Expense--Schedule C" for 1988.

9. Respondent concedes adjustment for "Supplies Expenses"--Schedule C" for all years in issue.

10. Respondent and the Takaos agree the adjustments for "Travel Expenses--Schedule C" are settled by reducing the amounts as follows:

| | |
|---|---|
| 1988 | $2,073 |

(continued...)

---

[3](...continued)

| 1989 | 2,400 |
|------|-------|
| 1990 | 2,669 |
| 1991 | 2,947 |

In the stipulation of settled issues the years are shown as 1988, 1990, 1991, and 1992. We assume the years listed should have been shown as above inasmuch as tax year 1992 is not involved in the instant case. Should our assumption be erroneous, the parties should calculate the adjustments for "Travel Expenses -- Schedule C" in the Rule 155 computations in the manner necessary to comport with the agreement of the parties.

11. Respondent and the Takaos agree adjustments for "Meal Expenses--Schedule C" for 1988 and 1989 are settled by reducing the amounts by $2,424 and $3,000, respectively.

12. Respondent concedes adjustments for "CMA Investors Expense--Schedule E" for 1988 and 1989.

13. Respondent concedes adjustments for "Cleaning--Schedule E" for 1989.

14. Respondent concedes adjustments for "Depreciation--T/N Leasing--Schedule E" for 1989.

15. Respondent concedes adjustments for "Dishes Expense--Schedule C" for 1990 and 1991.

16. The Takaos concede adjustments for "Staff Meetings--Schedule C" for 1990 and 1991.

17. Respondent concedes adjustments for "Legal and Professional--Schedule C" for 1990.

18. The Takaos concede the correctness of the $5,000 adjustment for "Itemized Deductions for State Income Tax" for 1989.

19. Respondent concedes that the $5,000 adjustment for "Itemized Deductions for State Income Tax" for 1988 should be reduced by $4,148.

20. The Takaos concede the correctness of the adjustments for "Child Care--Sch. C" for 1989 and 1990 in the amounts of $1,000 and $3,600, respectively.

21. The Takaos and respondent agree that adjustments for "Insurance Expense--Sch. C" are reduced by $4,846 for each of the years 1988, 1989, 1990, and 1991.

22. The Takaos and respondent agree that adjustments for "Imputed Interest Income" are settled by reducing the dollar amounts as follows:

| 1988 | $30,495 |
|------|---------|
| 1989 | 45,445 |
| 1990 | 40,644 |
| 1991 | 27,436 |

(1)  Whether petitioners Yoshinori Takao (Yoshinori) and Akiko Takao (Akiko) (hereinafter collectively referred to as the Takaos) received unreported taxable income in the amounts of $122,483, $75,421, $114,935, and $109,094 for 1988, 1989, 1990, and 1991, respectively, as shown by unexplained bank deposits made by them during those years.  We hold that they received unreported income in the amounts decided herein.

(2)  Whether the Takaos received additional unreported income in the amounts of $9,000 and $58,320 for 1988 and 1989, respectively, as shown by certain cash purchases made by them during those years.  We hold that they received additional unreported income in the amounts decided herein.

(3)  Whether the Takaos are entitled to investment interest deductions in the amounts of $55,320, $38,355, $30,000, and $13,850 for 1988, 1989, 1990, and 1991, respectively.  We hold that they are not.

(4)  Whether the Takaos are liable for an addition to tax for late filing under section 6651(a) for 1988.  We hold that they are.

(5) Whether the Takaos are liable for an addition to tax for negligence under section 6653(a)(1) for 1988 and accuracy-related penalties for negligence under section 6662(a) for 1989, 1990, and 1991.  We hold that they are.

(6)  Whether the Takaos are liable for an addition to tax for substantial underpayment of tax under section 6661 for 1988. We hold that they are.

Toraya Corporation(docket No. 19181-94)   After concessions,[4] the following issues remain in dispute:  (1)

---

[4]  In a stipulation of settled issues filed Dec. 4, 1995, and an amended stipulation of settled issues filed May 14, 1996, the parties agreed as follows:
1.  Respondent concedes that adjustments for "Purchase Expense" should be decreased as follows:

| | |
|---|---|
| 1988 | $30,733 |
| 1989 | 5,114 |
| 1990 | 25,230 |
| 1991 | 24,000 |

Respondent also concedes that Toraya is entitled to an additional $6,000 purchase expense in 1990.
2.  Respondent concedes adjustments for "Amortization Expense" for all years in issue.
3.  Respondent and Toraya agree that adjustments for "Business Travel" are settled by reducing the amounts shown as follows:

| | |
|---|---|
| 1988 | $8,931 |
| 1990 | 4,400 |
| 1991 | 3,606 |

4.  Respondent and Toraya agree that adjustments for "Truck Expense" for all years in issue are settled by reducing the amounts as follows:

| | |
|---|---|
| 1988 | $13,000 |
| 1989 | 4,123 |
| 1990 | 3,936 |
| 1991 | 2,009 |

5.  Toraya concedes that the adjustment for "Employee Meeting Expense" for 1988 in the amount of $6,455 is correct.
6.  Respondent concedes that the adjustment for "Office Expenses" for 1988 should be reduced by $1,800.  The remaining amounts for the years in issue under this adjustment remain in dispute.
7.  Respondent concedes adjustments entitled "Restaurant Expenses" for 1988 and 1989.
8.  Respondent concedes the adjustment for "Rent Expenses" for 1988.
9.  Respondent concedes adjustments entitled "Depreciation Expenses -- Auto" and "Depreciation Expenses -- Other" for all

(continued...)

Whether petitioner Toraya Corp. (Toraya) received unreported income from sales in the amounts of $94,500, $102,275, $81,506, and $58,271 for 1988, 1989, 1990, and 1991, respectively, as shown by cash deposits made by the Kudos[5] and cash deposits and cash purchases made by the Takaos during those years. We hold that Toraya received unreported income in the amounts decided herein.

(2) Whether Toraya is entitled to deduct payments, classified as office expenses, made to Motomi in 1988 and 1989 in the amounts of $7,933 and $12,000, respectively. We hold that it is to the extent decided herein.

---

[4](...continued)
years in issue.

10. Respondent concedes the adjustment for "Repairs Expenses" for 1989.

11. Respondent concedes adjustments for "Earthquake Damage" for 1989.

12. Respondent concedes the adjustment for "Payment from Franchise Tax Board" for 1988.

13. Respondent concedes that Toraya is entitled to a $25,460 Targeted Jobs Credit and an Investment Tax Credit of $4,450 in 1988.

14. Toraya concedes the adjustment for "Gain on disposition of vehicles" for 1990.

15. Respondent concedes adjustments for "Employee Benefits Expense" for 1988 and 1989.

16. Petitioner and Toraya agree that Toraya is entitled to deductions for imputed interest expense as follows:

| | |
|---|---|
| 1988 | $10,012 |
| 1989 | 7,992 |
| 1990 | 7,699 |
| 1991 | 6,310 |

[5] Respondent conceded on opening brief that cash deposits into the Kudos' bank accounts in the amounts of $42,506 for 1990 and $46,871 for 1991 are not gross receipts of Toraya.

- 9 -

(3)  Whether Toraya is entitled to claim or treat as cost of goods sold the payments made to Joan Takao (Joan) and Junichi Takao (Junichi) in the amounts of $27,000 to Joan in 1988, and $7,100 to Joan and $4,000 to Junichi in 1989.  We hold that it is entitled to claim them to the extent decided herein.

(4)  Whether Toraya is entitled to claim as cost of goods sold $19,917 in 1989, representing the beginning inventory balance of a restaurant Toraya closed that year.  We hold that it is to the extent decided herein.

(5)  Whether Toraya is liable for an addition to tax for late filing under section 6651(a) for 1988.[6]  We hold that it is.

(6)  Whether Toraya is liable for an addition to tax for negligence under section 6653(a)(1) for 1988, and accuracy-related penalties under section 6662(a) for 1989 through 1991. We hold that it is.

(7)  Whether Toraya is liable for an addition to tax for substantial underpayment of tax under section 6661 for 1988.  We hold that it is.

(8)  Alternatively, if the Court determines that Toraya had unreported income from unreported sales, whether it is entitled to theft loss deductions for 1988 through 1991.  We hold that it is not.

---

[6]  Respondent conceded on opening brief that Toraya is not liable for a late filing addition under sec. 6651(a)(1) for 1989.

## FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Facts Relating to the Kudos

When Scott and Motomi filed their petitions herein, they resided in Burlingame, California.  In 1990 and 1991, and for previous years, the Kudos were employed by Toraya, which owned and operated two Japanese restaurants, one located in Berkeley, California (Berkeley restaurant), and the other located at 1734 Post Street, in San Francisco, California (Post Street restaurant).  The Kudos were employed at the Post Street restaurant.[7]  Motomi was the manager of that restaurant.  Yoshinori and Akiko, Motomi's father and mother, owned all of the shares of Toraya.  Akiko died about 10 months before this case was tried.

Motomi had attended college.  She took business and accounting courses in high school but not in college.  Scott was born and educated in Japan.  He studied English in Hawaii and business administration at the University of San Francisco.  Scott is generally able to speak and understand English, but he

---

[7]  On occasion, when her help was needed, Motomi also worked at a restaurant located on Fillmore Street which was owned by her parents.

is not completely fluent in or comfortable with it.  At trial,
Scott testified with the aid of an interpreter.

Motomi's duties at the Post Street restaurant generally
consisted of seating customers, answering the telephone, and
taking care of the cash register.  At times she also washed
dishes and cleaned up when there was no one else around to help.
Scott never handled the cash register or had anything to do with
cash at the Post Street restaurant.

The Kudos reported the following items of income on their
1990 and 1991 Federal income tax returns.

### 1990

| Item | | Amount |
|------|---|--------|
| Wages | | |
| Scott | $14,400 | |
| Motomi | 14,400 | |
| Total wages | | $28,800 |
| Interest | | 4,263 |
| Refund of State Taxes | | 805 |
| Total | | $33,868 |

### 1991

| Item | | Amount |
|------|---|--------|
| Wages | | |
| Scott | $19,200 | |
| Motomi | 19,200 | |
| Total wages | | $38,400 |
| Interest | | 4,068 |
| Refund of State Taxes | | 540 |
| Total | | $43,008 |

The Kudos received additional payments from Toraya in 1990
and 1991 as follows:

### 1990

| | Amount | Treatment by Toraya |
|---|---|---|
| Motomi | $25,230 | Deducted as purchase expenses |
| Motomi | 3,600 | Deducted as child care expenses |
| Scott | 3,600 | Deducted as truck expenses |
| Motomi | 7,933 | Deducted as office expenses |
| Total | $40,363 | |

### 1991

| | Amount | Treatment by Toraya |
|---|---|---|
| Motomi | $24,000 | Deducted as purchase expenses |
| Motomi | 12,000 | Deducted as office expenses |
| Total | 36,000 | |

Those additional payments were not reported on the Kudos' Forms W-2 for 1990 and 1991, and the payments were not reported as income by them on the tax returns they filed for those years.

On the Federal income tax returns they filed for 1990 and 1991, the Kudos did not claim any itemized deductions for expenses they incurred on Toraya's behalf. The parties now agree that the $25,230 and $24,000 payments Toraya made to Motomi in 1990 and 1991, respectively, are income to the Kudos. The parties also agree that the Kudos are entitled to additional itemized deductions on Schedule A in the amounts of $21,249 and $17,634 for 1990 and 1991, respectively.

Motomi handled the financial affairs for her family. In 1990 and 1991, she deposited cash in the amounts of $42,506 and $46,871, respectively, to the Kudos' bank account No. 037-439056 at Sumitomo Bank (Sumitomo account).

The Takaos and Edwin Nakamura (Nakamura) owned all of the interests in Toraya Apartments Partnership (Toraya Apartments), of which Nakamura was the managing general partner. Toraya Apartments' sole asset was a building located at 1734 Post Street, San Francisco, California. That building housed apartments and the Post Street restaurant. In 1991, the Kudos received two checks from Toraya Apartments in the amounts of $2,269.14 and $1,400, which were deposited in the Sumitomo account.

The Kudos have three children, including Nicholas, who was unable to speak until he was 8 years old. Nicholas' problem required the Kudos to take him to several different doctors and various therapists and specialists. Although at one point the Kudos were advised that Nicholas would never speak or hear, he began to speak when he was about 8 years old. He was 11 years old at the time of trial. Nicholas' medical expenses generally were not covered by insurance although some of his expenses may have been reimbursed by insurance in 1990 and 1991. The Kudos did not claim any deductions for medical or dental expenses on their 1990 or 1991 income tax return.

The Kudos' relatives in Japan knew of Nicholas' condition, and from time to time they would send small amounts of money to help pay for his treatment.[8] Scott's parents had helped his

---

[8] Exhibit 6, which consists of four undated letters that apparently accompanied "small" money donations (according to the
(continued...)

brothers and sister, and they wanted to equalize matters by helping Scott also.  The Kudos' relatives also sent cash gifts for family occasions such as Christmas and birthdays.

Scott made one or two trips to Japan in 1990 and one trip in 1991.

From time to time tenants at Toraya Apartments or restaurant employees would give Motomi cash, and she would write checks on their behalf for rent and other bills.  However, the record is devoid of specific names, dates, or amounts of any of those transactions.

When the Takaos went on trips, Motomi sometimes paid their bills, and she was reimbursed by them in cash.  For instance, in 1991 Motomi wrote checks totaling $770 to her parents' gardener.

In 1991 Motomi wrote checks totaling $6,009.49 to or on behalf of her brother, Junichi, who needed money at the time because he was going through a divorce.

During 1990 and 1991, Motomi often made separate, multiple cash deposits on a single day, several times per week.  For example, on January 28, 1991, Motomi made three deposits for $100, $140, and $200.  All of the deposits were made at the same time; i.e., on a single trip to the bank.  Motomi purportedly made deposits in that manner because she put cash from different

---

[8](...continued)
letters), refer to Nicholas as "Takao".  The exhibit was received in evidence for the nonhearsay purpose of showing the relatives' knowledge.

sources in separate envelopes, but she did not save the envelopes nor keep any other contemporaneous records of the sources of the cash.

Nakamura, a certified public accountant, prepared the Kudos' individual Federal income tax returns for 1990, 1991, and previous years.[9]  Motomi would give him a manila envelope containing the Kudos' Forms 1099, a sheet of paper listing charitable contributions and other deductions, and other items she thought important.  Nakamura did not request or receive bank records.  In preparing their income tax returns, Nakamura did not include in the Kudos' income certain payments from Toraya, because he viewed them as nontaxable reimbursements.

The Kudos owned a personal residence in San Bruno, California, during 1988 and until March 1989, when they sold that residence.  During April 1989, the Kudos purchased a personal residence in Burlingame, California, for which they paid $550,000.  During 1990 and 1991, the Kudos made mortgage payments on their personal residence in the amounts of $31,827.72 and $27,413.86, respectively.

Facts Relating to the Takaos

When they filed their petitions, the Takaos resided in Burlingame, California.  Akiko died on June 10, 1995, at the age of 69.

---

[9]  Nakamura also prepared the returns for the Takaos and Toraya.

Yoshinori was born in the United States in 1924. He attended school here through third grade. When he was 8 years old, Yoshinori's father died and Yoshinori and his mother moved to Japan. Yoshinori completed his education through 2 years of college in Japan. Yoshinori married Akiko in Japan in 1951. They moved to the United States in December 1958. Yoshinori's understanding of English was not very good, and he testified with the aid of an interpreter.

Akiko was born in Japan. She could speak and understand very little English. She could not write checks or drive. Nevertheless, Akiko handled the family's personal financial affairs and controlled all the Takaos' personal savings and bank accounts.

During the years in issue and for prior years, the Takaos owned individually a Japanese restaurant located at 1914 Fillmore Street, San Francisco, California (Fillmore Street restaurant), which was managed by the Takaos' younger son, Frank Takao. The Fillmore Street restaurant operated under the name "Toraya". Yoshinori purchased the Fillmore Street restaurant, his first restaurant, in 1965.

During the years in issue the Takaos owned 100 percent of the shares of Toraya, which owned and operated the Berkeley restaurant and the Post Street restaurant in 1988 and 1989. They operated also under the name "Toraya". Junichi, the Takao's oldest son, managed the Berkeley restaurant. Toraya closed the

Berkeley restaurant in June 1989.  In 1990 and 1991, Toraya operated only the Post Street restaurant.

During 1988 through 1991, Akiko worked at the Post Street restaurant, usually as a hostess.  When the restaurant was busy, however, she would write orders.  During 1988 through 1991, Yoshinori worked mostly at the Post Street restaurant, as a chef, although he sometimes worked also at the Berkeley restaurant.  In 1990 and 1991, Akiko or Motomi handled the cash at the Post Street restaurant.

During the years in issue, the Takaos owned a two-thirds interest in the Toraya Apartments.

The Takaos' tax returns for 1989 through 1991 indicate Yoshinori's occupation as "Retired".  The Takaos' tax returns for 1990 and 1991 indicate Akiko's occupation as "Retired".

The Takaos reported the following items of taxable income (or loss) on their tax returns for the years 1988 through 1991:

| Item | Amount | | | |
|---|---|---|---|---|
| | 1988 | 1989 | 1990 | 1991 |
| Wages | $7,675 | $6,440 | $5,000 | $4,800 |
| Interest | 45,299 | 50,643 | 46,553 | 40,999 |
| Dividends | -- | -- | -- | -- |
| Refunds | 2,388 | -- | 528 | 264 |
| Sch. C income | (159) | 699 | 857 | (14,150) |
| Capital gain (or loss) | (3,000) | -- | (3,000) | (3,000) |
| Other gains (or losses) | -- | -- | -- | (12,500) |
| IRA distributions | | | | 3,371 |
| Sch. E income | 15,230 | 174 | (7,116) | 5,317 |
| Social security | -- | -- | 87 | -- |
| Total | 67,433 | 57,956 | 42,909 | 25,101 |

For 1990, the Takaos also reported tax-exempt interest income in the amount of $5,062.  For 1991, the Takaos also reported nontaxable dividend distributions of $7,040.

The Takaos received income or payments from, among other things, the following sources in 1982 through 1987:

| | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | Total |
|---|---|---|---|---|---|---|---|
| Wages | $29,050 | $20,000 | $19,800 | $19,800 | $19,675 | $16,042 | $124,367 |
| Interest income: | | | | | | | |
| Banks: | | | | | | | |
| SF Federal Savings | 353 | 240 | 8,573 | 30,010 | 35,788 | 35,192 | 110,156 |
| Sumitomo | 15,786 | 17,608 | 59,244 | 23,598 | 15,315 | 5,717 | 137,268 |
| California First | 32,008 | 26,085 | 185 | 441 | 252 | 104 | 59,075 |
| Total interest- banks | 48,147 | 43,933 | 68,002 | 54,049 | 51,355 | 41,013 | 306,499 |
| Other interest: | | | | | | | |
| IRS | 1,714 | 18 | -- | 636 | -- | -- | 2,368 |
| John Hancock | 99 | 100 | 101 | 124 | 150 | 180 | 754 |
| Edwin Nakamura | 14,917 | -- | -- | -- | -- | -- | 14,917 |
| Bruce Bedig | -- | 10,716 | 7,781 | 7,613 | 9,696 | 23,165 | 58,971 |
| Norager, Inc. | -- | -- | 1,260 | -- | -- | -- | 1,260 |
| USA Publishing | -- | -- | 4,841 | -- | -- | -- | 4,841 |
| Partnership /S-Corp. | -- | -- | -- | -- | -- | 11 | 11 |
| Total other interest | 16,730 | 10,834 | 13,983 | 8,373 | 9,846 | 23,356 | 83,122 |
| Total interest income | 64,877 | 54,767 | 81,985 | 62,422 | 61,201 | 64,369 | 389,621 |
| Installment sales | | | | | | | |

| payments: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Silver Lake | 121,819 | 31,903 | 31,903 | 9,328 | 8,460 | -- | 203,413 |
| Sierra Lakes | 183,181 | 45,909 | 45,910 | 13,059 | 11,844 | 21,487 | 321,390 |
| Total installment sales | 305,000 | 77,812 | 77,813 | 22,387 | 20,304 | 21,487 | 524,803 |
| Total | 398,927 | 152,579 | 179,598 | 104,609 | 101,180 | 101,898 | 1,038,791 |

In 1982 Nakamura gave Akiko checks in the amounts of $305,000 and $14,000 from the Silver Lake and Sierra Lakes installment sales. The $305,000 check represented Yoshinori's share of the 1982 payments. The $14,000 check represented Nakamura's share of the 1982 payment and constituted his profits on the sales, which he gave to Akiko because she had lent him money for the investments. Akiko did not deposit the $305,000 check in the bank in the year she received it.

Akiko kept cash in her home. Although Yoshinori was aware that Akiko kept cash at home in a safe and in other places around the house, he had no idea how much she had on hand at any time. While she was living, only Akiko had the combination to the safe. Akiko began to deposit money in banks in order to earn interest, because Nakamura and a bank employee advised her to do so. Akiko maintained accounts in banks before the years in issue.

When Nakamura discovered that Akiko was keeping cash at home and was told that Akiko was paying cash for a Mercedes Benz, he advised her against keeping cash in the house because of gangs which were breaking into Japanese homes where they knew that cash

was generally kept at home. Nakamura advised Akiko to put her money in the bank.

Motomi knew that Akiko kept cash at home, but Motomi did not know how much cash Akiko had at hand at any time. Motomi also was aware that Akiko kept money in bank accounts. At the time of trial, Motomi did not know how much cash Akiko had at home at the time of her death, but Motomi believed that it was a large sum.

In 1955, Akiko inherited ¥500,000 from her grandmother.[10] In 1959, Akiko lent that amount to her parents so that they could remodel an apartment they owned in Japan. Her parents agreed to repay the loan by sending Akiko $300 per month (i.e., the rental value of one room in the apartment) for the rest of their lives. Yoshinori and Akiko traveled to Japan approximately twice a year, and sometimes Akiko brought back money given to her by her parents. On occasion, friends from Japan visiting the Takaos brought money to them from Akiko's parents. Akiko's father died before 1988, but her mother was still alive through 1991 and continued to repay the loan through that time. Therefore, Akiko received $3,600 each year in issue for the repayment of the loan to her parents, and that amount is not taxable income to the Takaos.

Kendo is a form of martial arts. Yoshinori was active in the kendo organization. He served as president of the U.S. Kendo Association and traveled around the United States to promote the

---

[10] The record does not disclose the equivalent in dollars.

sport. Yoshinori held the second highest kendo rank and was a representative to the World Kendo Association in Japan. Because of Yoshinori's frequent travel, the Takaos gave Nakamura a power of attorney to write checks on their behalf. Nakamura had handled the Takaos' financial affairs and prepared their tax returns since 1965.

During the years in issue, the Takaos made bank deposits as follows:

| Year | Amount |
|------|--------|
| 1988 | $122,483 |
| 1989 | 75,421 |
| 1990 | 114,935 |
| 1991 | 109,094 |

Of the 1991 deposits, $48,194, $26,244, and $7,495 were deposited into bank accounts in Japan. The parties have stipulated that those deposits were rents received from an apartment building the Takaos owned in Tokyo, Japan. Construction of the apartment building was completed in 1991. The parties have stipulated further that only $10,108 of the Japanese bank deposits is taxable income, rather than the $81,933 determined in the notice of deficiency. The rental deposits in the Japanese banks were not reported on the Takaos' 1991 return, because Nakamura believed that, since Japanese tax returns were filed, there was no need to report the income on the U.S. returns because of the foreign tax credit.

Of the above-listed unexplained deposits, the following consisted of cash deposits:

| Year | Amount |
|------|--------|
| 1988 | $85,500 |
| 1989 | 46,955 |
| 1990 | 39,000 |
| 1991 | 11,400 |

On November 23, 1988, Akiko used $9,000 in cash to purchase a cashier's check. On February 1, 1989, Yoshinori paid $55,320 in cash to purchase a Mercedes Benz. On April 19, 1989, Akiko used $3,000 in cash to purchase a traveler's check.

During March 1983, Yoshinori, Nakamura, Harry Norager, and a Dr. Morrison became shareholders in Norager, Inc. (Norager). On April 1, 1983, Norager purchased the Capri Restaurant from Pier 29, Inc. (Pier 29). The purchase price was $600,000, consisting of $400,000 in cash, which was borrowed from Alameda First Bank, and a note in the amount of $200,000 given to the former owners of the Capri Restaurant. The Takaos owned a 25-percent interest in the capital stock of Norager. Operation of the Capri Restaurant was Norager's only business activity. Dr. Morrison withdrew from the venture in 1984, and Henry Norager withdrew in 1986, leaving only Nakamura and Yoshinori with interests in the venture after 1986.

On December 31, 1987, Nakamura executed a promissory note on behalf of Norager wherein Norager promised to pay Yoshinori the sum of $94,000 with interest from that date at the rate of 10 percent per year. The due date of any unpaid principal and

accrued interest was December 31, 1992, although Norager had the right to pay all or part of the amount due before that due date.

During 1986, the Takaos lent Honkers Sound Co., Inc. (Honkers), at least $102,000. Honkers operated a stereo store and sold stereo equipment. Honkers ceased doing business during 1991. Honkers was owned by Henry M. Hong and Carol J. Hong.

In the Government's opening brief, respondent concedes that the Takaos are entitled to a capital loss deduction for 1991 for bad debt losses from loans to Honkers and Norager and to an ordinary loss deduction of $12,500 for 1991 resulting from their ownership of shares in Norager.

On May 20, 1986, Nakamura executed a promissory note on behalf of Toraya Apartments wherein Toraya Apartments agreed to pay Akiko or Yoshinori $100,611.60 with interest from that date at the rate of 12 percent per year. The due date of the promissory note was May 20, 1996, but Toraya Apartments had the right to pay some or all of the amount due before that due date.

Investment Interest

In 1988, Nakamura wrote a check for $55,323.18 to Pier 29 from a "special account" that was in his name although the money in the account belonged to Yoshinori. The check purportedly was interest on a loan that arose from the purchase of an operating license for the Capri Restaurant and certain furniture and fixtures from Pier 29.

For 1988, the Takaos filed Form 4952, Investment Interest Expense Deduction, with their tax return on which is reflected "Interest expense on investment debts paid or accrued in 1988" in the amount of $55,320, "Allowed investment interest expense" in the amount of $49,299, and "Disallowed investment interest expense" in the amount of $6,021. The Takaos reported "Deductible investment interest" in the amount of $49,299 on Schedule A--Itemized Deductions for 1988.

For 1989, the Takaos filed Form 4952, Investment Interest Expense Deduction, with their tax return on which is reflected "Investment interest expense paid or accrued in 1989" in the amount of $32,334, "Disallowed investment interest expense from 1988" in the amount of $6,021, "Investment interest expense deduction" in the amount of $38,355, and "Disallowed investment interest expense" in the amount of zero. The Takaos reported "Deductible investment interest" in the amount of $38,355 on Schedule A--Itemized Deductions for 1989. On Schedule B of the tax return he filed for 1989, Nakamura reported income of $30,000 from Yoshinori.

For 1990, the Takaos filed Form 4952, Investment Interest Expense Deduction, with their tax return on which is reflected "Investment interest expense paid or accrued in 1990" in the amount of $30,000, "Investment interest expense deduction" in the amount of $30,000, and "Disallowed investment interest expense" in the amount of zero. The Takaos reported "Deductible

investment interest" in the amount of $30,000 on Schedule A--Itemized Deductions for 1990.  On the return he filed for 1990, Nakamura reported $30,000 interest income from Yoshinori.  The payment purportedly consisted of (1) interest on a loan from Nakamura to the Takaos to enable Yoshinori to make a payment on a loan he owed his sister, Sachiko Hada (Hada), and (2) service charge interest.  The record is silent as to the purpose of the Hada loan or the nature of the transaction for which the service charge interest was calculated.  On April 1, 1990, the Takaos and Nakamura signed a promissory note in which the Takaos promised to pay Hada $117,000 in two payments, with the first payment of $40,000 due on or before August 17, 1990, and the second payment of $77,000 due on or before August 17, 1991.  Nakamura agreed to secure payment on the loan.  No interest was due on the loan if timely principal payments were made.  Subsequently, on August 17, 1990, Yoshinori signed a note promising to pay Nakamura $32,000, with interest at the rate of 1.25 percent per month, computed from and after August 17, 1990.  The note specified that Nakamura could designate payments on the note as an application of accrued interest.  The note indicated that proceeds from the loan from Nakamura would be used for the first payment of the "Hada loan".

For 1991, the Takaos filed Form 4952, Investment Interest Expense Deduction, with their tax return on which is reflected "Investment interest expense paid or accrued in 1991" in the amount of $13,850, "Investment interest expense deduction" in the

amount of $13,850, and "Disallowed investment interest expense" in the amount of zero. The Takaos reported "Deductible investment interest" in the amount of $13,850 on Schedule A-- Itemized Deductions for 1991, purportedly based on imputed interest on a loan from Hada.[11]

Throughout their association, Yoshinori was involved in several financial dealings with Nakamura, and he trusted and relied on Nakamura. Yoshinori delegated many of his financial affairs to Nakamura. Nakamura is listed as a signatory on the Takaos' business checking account. He prepared the Takaos' tax returns for the years 1988 through 1991 as well as Toraya's tax returns for the same years.

The Takaos' 1988 tax return was filed October 3, 1990. Respondent granted the Takaos an extension to file their 1988 tax return until October 15, 1989.

Facts Relating to Toraya

When it filed its petition, Toraya maintained its principal place of business in San Francisco, California. Toraya was an accrual basis taxpayer.

In 1985, Toraya began changing its restaurants' menus from standard sitdown restaurant fare to sushi bar fare. However, the restaurants did not maintain a straight sushi bar menu. At that time, the sushi bar concept was known in Japan, but not common in

---

[11] There is no evidence that any interest was in fact paid, that it was declared by Hada, or whether it would have qualified as investment interest.

the San Francisco area. Yoshinori traveled to Japan and other places to learn how to operate a sushi bar restaurant and to investigate and purchase necessary equipment.

In 1988 and 1989, Toraya operated the Post Street restaurant and the Berkeley restaurant. After June 30, 1989, Toraya operated only the Post Street restaurant because Toraya closed the Berkeley restaurant after Junichi, who served as manager of that restaurant, left the San Francisco area.

On its 1988 return, Toraya claimed $9,733 in office expenses of which $7,933 purportedly was paid to Motomi to reimburse her for expenses she incurred in maintaining an office in her home. On its 1989 return, Toraya claimed $12,000 in office expenses all of which purportedly was paid to Motomi to reimburse her for expenses she incurred in maintaining an office in her home.

Junichi is Yoshinori and Akiko's son (and Motomi's brother). Joan was Junichi's wife during the years 1988 and 1989. They were subsequently divorced.[12] Although Junichi managed the day-to-day operations of the Berkeley restaurant, Joan handled its financial affairs (in a manner similar to the way Motomi handled the financial affairs for the Post Street restaurant). That is, Junichi would take home the receipts from the restaurant, the waitress tags, the cash register receipts, and all the charge tickets, and Joan would reconcile the cash register tape to the

---

[12] At the time of trial, Junichi was living in Hawaii and Joan in the State of Washington. Junichi and Joan are not parties in this case.

daily receipts.  She kept a daily sales journal, and at the end of the month she would total up that journal and send it to Nakamura, so that he could calculate the sales tax and pay it.

Junichi purchased food for the Berkeley restaurant.  During 1988 and part of 1989, Nakamura would write a check to Joan on Toraya's account, and she would deposit it in an account Joan maintained at a bank located two blocks from the Berkeley restaurant.  Junichi would then draw out cash as needed to pay for food for the Berkeley restaurant.  Junichi used cash because the best produce markets in the San Francisco area supplying Japanese restaurants were run by Japanese families who accepted cash only.

In 1988 and 1989, Toraya wrote the following checks to Joan:

## 1988

| Date | Check No. | Amount | Memo notation |
|------|-----------|--------|---------------|
| 1/15 | 762 | $1,500 | -- |
| 2/20 | 773 | 1,500 | Purchases, cash |
| 3/28 | 785 | 2,000 | Pur. |
| 4/22 | 790 | 1,500 | Purchases |
| 5/20 | 794 | 1,500 | -- |
| 6/2 | 797 | 1,500 | Purchases |
| 6/20 | 801 | 1,500 | Purchases |
| 6/27 | 803 | 2,700 | -- |
| 7/15 | 805 | 600 | -- |
| 8/6 | 811 | 1,700 | -- |
| 9/8 | 818 | 1,500 | -- |
| 9/22 | 821 | 1,500 | -- |
| 10/20 | 826 | 1,500 | -- |
| 11/5 | 830 | 1,000 | -- |
| 12/5 | 833 | 1,500 | -- |
| 12/12 | 834 | 1,300 | -- |
| Total | | 24,300 | |

## 1989

| Date | Check No. | Amount | Memo notation |
|------|-----------|--------|---------------|
| 1/9 | 839 | $1,500 | -- |
| 2/3 | 844 | 1,500 | -- |
| 2/21 | 845 | 1,500 | -- |
| 3/21 | 850 | 1,500 | -- |
| 4/25 | 856 | 1,100 | Payroll |
| Total | | 7,100 | |

In 1989, Toraya wrote the following checks to cash which were endorsed by Junichi:

| Date | Check No. | Amount | Memo notation |
|------|-----------|--------|---------------|
| 5/15 | 860 | $1,000 | Produce |
| 5/31 | 863 | 1,000 | Sushi bar/food |
| 6/28 | 865 | 2,000 | Jun Remb Produce |

The checks were signed by Nakamura and drawn on Toraya's bank account. Until Joan left Junichi, Nakamura made the checks payable to Joan, because the custom in the Takao families was for the women to handle the money.

On its 1988 and 1989 tax returns, Toraya treated the payments to Joan and the checks payable to cash and endorsed by Junichi as purchases in the cost of goods sold section of the returns.

Toraya's general ledger shows that the 1989 beginning inventory for the Berkeley restaurant in the amount of $19,917 remained on its records when that restaurant was closed on June 30, 1989. Inventory remaining when the Berkeley restaurant was closed was transferred to Toraya's Post Street restaurant.

Toraya's beginning inventory reported on its 1989 return included the Berkeley inventory plus the Post Street inventory. At the end of 1989 only the Post Street restaurant was open. On its 1989 tax return Toraya wrote off the $19,917 Berkeley restaurant beginning inventory as a purchases expense.

Toraya's inventory was not commingled with the Fillmore Street restaurant's inventory or transferred to the Fillmore Street restaurant. The Fillmore Street restaurant was a straight Sushi bar and served mostly fish dishes. The Post Street and Berkeley restaurants served more meat dishes. Frozen meat could be transferred, but frozen fish was not appropriate for sushi.

Toraya's tax returns reflect the following gross receipts, cost of goods sold (COGS), taxable income before net operating loss (NOL), and unappropriated retained earnings per Toraya's books and records for the years 1988 through 1991:

|  | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| Gross receipts | $922,439 | $648,927 | $449,608 | $421,608 |
| COGS | 340,311 | 232,303 | 152,934 | 132,107 |
| Taxable income before NOL | (4,983) | (1,361) | 5,315 | (13,929) |
| Retained earnings per books | 162,390 | 160,153 | $164,492 | 132,322 |

Nakamura advised the Takaos that every cash transaction should be rung up. He also advised the Takaos to check the waitress tags against the cash register tapes at the end of the day to make sure that every transaction was recorded. Nakamura

did not observe personally the counting of the cash at the restaurants.

Nakamura prepared Toraya's tax returns for the years ending 1988, 1989, 1990, and 1991. In preparing Toraya's tax returns, Nakamura believed that he was picking up all taxable sales. He did not have waitress tags from daily sales, cash receipt records, or bills and statements from the restaurants.

Toraya filed its 1988 calendar year tax return on or about July 21, 1990. It filed its 1989 calendar year tax return on or about August 26, 1990. Toraya had an extension to file the 1989 return to September 15, 1990. Respondent concedes that Toraya timely filed its 1989 return.

OPINION

The Commissioner's deficiency determination is normally entitled to a presumption of correctness, Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985), and the burden of proving the determination erroneous generally rests on the taxpayer, Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). However, in the case of unreported income, the rule in the Court of Appeals for the Ninth Circuit (to which this case is appealable) is that the presumption in favor of the Commissioner arises only where it is supported by a minimal factual foundation linking the taxpayer with income-producing activity. See, e.g., Palmer v. United States, 116 F.3d 1309, 1313 (9th Cir. 1997); Rapp v. Commissioner, supra; Delaney v. Commissioner, 743 F.2d 670, 671

(9th Cir. 1984), affg. T.C. Memo. 1982-666; <u>Edwards v. Commissioner</u>, 680 F.2d 1268, 1270 (9th Cir. 1982); <u>Weimerskirch v. Commissioner</u>, 596 F.2d 358, 360-361 (9th Cir. 1979) ("the Commissioner must offer some foundational support for the deficiency determination before the presumption of correctness attaches to it"), revg. 67 T.C. 672 (1977).  Once the Government has carried its initial burden of introducing some minimal evidence linking the taxpayer with income-producing activity, the burden shifts to the taxpayer to rebut the presumption by establishing by a preponderance of the evidence that the deficiency determination is arbitrary or erroneous.  <u>Rapp v. Commissioner</u>, <u>supra</u> at 935; <u>Adamson v. Commissioner</u>, 745 F.2d 541, 547 (9th Cir. 1984), affg. T.C. Memo. 1982-371; <u>United States v. Stonehill</u>, 702 F.2d 1288, 1294 (9th Cir. 1983).

Respondent has established petitioners' connection with an income-producing activity, such as the restaurant, rental property, the lending of money, and the sale of real estate. Therefore, petitioners bear the burden of proving that respondent erred.

Section 6001 requires all taxpayers to maintain adequate books and records of taxable income.  In the absence of adequate records, the Commissioner is authorized to reconstruct a taxpayer's income by any reasonable method that clearly reflects the taxpayer's income.  Sec. 446(b); <u>Holland v. United States</u>, 348 U.S. 121, 130-132 (1954); <u>Cracchiola v. Commissioner</u>, 643

F.2d 1383, 1385 (9th Cir. 1981), affg. per curiam T.C. Memo. 1979-3; Parks v. Commissioner, 94 T.C. 654, 658 (1990). One of these methods, the bank deposits and cash expenditure method, has long been sanctioned by the courts. Clayton v. Commissioner, 102 T.C. 632, 645 (1994); see, e.g., United States v. Soulard, 730 F.2d 1292 (9th Cir. 1984); United States v. Hall, 650 F.2d 994 (9th Cir. 1981).

Bank deposits are prima facie evidence of income, and the Commissioner need not prove a likely source of that income. Clayton v. Commissioner, supra at 645; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income, but the Government must take into account any nontaxable source or deductible expense of which it has knowledge. Clayton v. Commissioner, supra at 646; DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 959 F.2d 16 (2d Cir. 1992). The taxpayer has the burden of proving that the deposits came from a nontaxable source. See Calhoun v. United States, 591 F.2d 1243, 1245 (9th Cir. 1978); Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-48.

## The Kudos

### Unreported Income

In the notice of deficiency respondent determined that for 1990 the Kudos had unreported income as shown by unexplained bank

deposits of $55,979. Respondent now concedes that the adjustment for 1990 should be reduced to $42,506. The record is silent as to the ground for the reduction. For 1991, respondent determined that the Kudos had unreported income as shown by unexplained bank deposits of $57,795. Respondent now concedes that $625 of the unexplained deposits came from a nontaxable insurance payment and that $4,132 came from nontaxable tax refunds. Thus, the amount at issue for 1991 is $53,011.

The Kudos testified that they received some insurance reimbursements and contributions from relatives for medical expenses of their son Nicholas. However, the testimony was not specific as to amounts, sources, or dates. Similarly, Motomi and Scott testified that they periodically received gifts from relatives in Japan for holidays and other celebrations. Motomi also testified that she sometimes wrote checks to pay bills for tenants of the apartments and restaurant employees who did not have bank accounts, and they gave her the cash. She also paid her parents' gardener when they traveled and was repaid in cash when they returned. Again, the testimony was vague. The Court is not required to accept unsubstantiated testimony. Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159.

Nevertheless, we believe that the Kudos did receive some amounts of this nature and that those amounts were deposited in the bank. We thus find that the Kudos are entitled to reductions

of their unexplained bank deposits in addition to those conceded by respondent as follows:

| Item | 1990 | 1991 |
|------|------|------|
| Insurance reimbursements, contributions from relatives for Nicholas | $2,500 | $2,500 |
| Other gifts from relatives | 500 | 500 |
| Reimbursements--parents | 500 | 1,000 |
| Reimbursements--check writing | 1,000 | 1,000 |
| Total reductions | $4,500 | $5,000 |

Although Scott testified that he made one or two trips to Japan in 1990 and one in 1991, bringing back money both times, we do not allow any additional amounts based on that testimony. It is too vague for us to make findings regarding the dates and amounts. Neither do we allow anything in 1991 for repayment of a loan to Motomi's brother, Junichi. Although there is evidence that a loan was made in that year, the record is silent as to when, if ever, or in what amounts or form, Junichi repaid it. With regard to the remaining unexplained bank deposits, we sustain respondent.

We turn now to the penalties for 1990 and 1991 under section 6662(a).

Section 6662(a)

Respondent determined that the Kudos are liable for accuracy-related penalties for negligence under section 6662(a) for 1990 and 1991. Petitioners contend that the Kudos were not negligent, because they relied in good faith on Nakamura to prepare their tax returns properly for those years. Respondent contends that petitioners failed to prove that the Kudos had

reasonable cause for understating their income on their returns for 1990 or 1991, and respondent contends that the understatements constitute negligence within the meaning of section 6662(a)(1).

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the underpayment of tax attributable to one or more of the items set forth in section 6662(b). Respondent asserts that the entire underpayment of petitioners' tax was due to negligence or intentional disregard of rules or regulations, sec. 6662(b)(1), and to a substantial understatement, sec. 6662(b)(2).

Petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a); Axelrod v. Commissioner, 56 T.C. 248, 258-259 (1971).

"Negligence" includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs. There is a substantial understatement of income tax if the amount of the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000. Sec. 6662(d)(1)(A). For purposes of section 6662(d)(1), "understatement" is defined as the excess of tax required to be shown on the return over the amount of tax that is shown on the return reduced by any rebate within the meaning of section 6211(b)(2). Sec. 6662(d)(2)(A). Any

understatement is reduced by the portion of the understatement attributable to an item for which there is substantial authority for the treatment by the taxpayer or where the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. Sec. 6662(d)(2)(B).

The Kudos' failure to maintain and to produce reliable records of their financial transactions and taxable income supports a conclusion of negligence. Crocker v. Commissioner, 92 T.C. 899, 917 (1989); Schroeder v. Commissioner, 40 T.C. 30, 34 (1963). Moreover, they cannot avoid the penalty on the grounds of reliance on their tax preparer, because the Kudos did not provide Nakamura with bank records or other records of the bank deposits sufficient to prepare their returns accurately. Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 662 (1987). The evidence justifies imposition of the penalty for negligence and/or substantial understatement for each year.

We apply the penalty only to the portion of the understatement attributable to unexplained bank deposits and to the "Taxes Paid by Employer" issue for 1990, not to other items raised in the notice of deficiency.

The Takaos

Unreported Income

Respondent contends that the Takaos had unreported income for the years in issue, as evidenced by the unexplained bank

deposits and cash purchases described below.  Except to the extent conceded, petitioners contend that the Takaos did not underreport their income.

Unexplained Bank Deposits

In the notices of deficiency for 1988 through 1991, respondent determined that the Takaos had unexplained bank deposits in the amounts set forth below.  However, respondent concedes that the adjustments for unexplained bank deposits should be reduced as shown below.  Additionally, petitioners concede that the Takaos' 1991 Japanese rental income was understated as described below.

For 1988, the unexplained bank deposits and respondent's concession are as follows:

| Source | Amount |
| --- | --- |
| Cash deposits to accounts in United States | $85,500 |
| Check from USA Publishing | 5,000 |
| Checks from Toraya Apartments | 5,200 |
| Check from Robert Wong | 2,500 |
| Check from Toraya Corp. | 1,000 |
| Check from Motomi | 2,000 |
| Check from Thomas Timbale | 1,601 |
| Deposits to Transamerica account | 6,112 |
| Deposits from unknown sources | 15,568 |
| Total | 124,481 |
| Less amount conceded | [1]13,837 |
| Unexplained deposits in issue | 110,644 |

[1]  In a stipulation of settled issues, respondent conceded that the adjustment for "Unexplained deposits" in the notice of deficiency for 1988 should be reduced $13,837, but respondent did not identify the source or sources from which the conceded amounts came.  For purposes of the discussion below, we assume that the source is either cash deposits to accounts in the United States or deposits from unknown sources.  Should our assumption be incorrect, the parties should make the appropriate correction

in their Rule 155 calculation in order that the calculation comports with respondent's concession.

For 1989, the unexplained bank deposits and respondent's

concession are as follows:

| Source | Amount |
|---|---|
| Cash deposits to accounts in United States | $43,955 |
| Check from USA Publishing | 6,000 |
| Check from Robert Wong | 5,500 |
| Check from Motomi | 3,000 |
| Check from Thomas Timbale | 5,276 |
| Deposits to Transamerica account | 3,644 |
| Check from Kanda A.G. | 163 |
| Check from Fusaku Aaoyaga | 500 |
| Total | 68,038 |
| Less amount conceded | [1]6,238 |
| Unexplained deposits in issue | 61,800 |

[1] In a stipulation of settled issues, respondent conceded that the adjustment for "Unexplained deposits" in the notice of deficiency for 1989 should be reduced $6,238, but respondent did not identify the source or sources from which the conceded amounts came. For purposes of the discussion below, we assume that the source is either cash deposits to accounts in the United States or deposits from unknown sources. Should our assumption, be incorrect, the parties should make the appropriate correction in their Rule 155 calculation in order that the calculation comports with respondent's concession.

For 1990, the unexplained bank deposits are as follows:

| Source | Amount |
|---|---|
| Cash deposits to accounts in United States | $39,000 |
| Checks from Toraya Apartments | 7,000 |
| Check from Motomi | 2,295 |
| Check from Yashitaki Aoyagi | 521 |
| Check from California Physicians | 3,357 |
| Check from Nakamura | 32,000 |
| Deposits from unknown sources | 30,761 |
| Unexplained deposits in issue | 114,934 |

For 1991, the unexplained bank deposits and petitioners'

concession are as follows:

| Source | Amount |
|---|---|
| Cash deposits to accounts in United States | $11,400 |
| Deposits to accounts in Japan | 81,933 |
| Check from USA Publishing | 2,000 |
| Check from Toraya Apartments | 2,000 |
| Check from Alameda County | 1,688 |
| Deposits from unknown sources | 10,081 |
| Total | 109,102 |
| Less deposits to accounts in Japan conceded | [1]71,825 |
| Unexplained deposits in issue | 37,277 |

[1] The Takaos agree that $10,108 of the $81,933 deposited to accounts in Japan is taxable income from rents that was not reported on their 1991 tax return.

As we stated supra, bank deposits are prima facie evidence of income, and respondent need not prove its likely source. Clayton v. Commissioner, 102 T.C. at 645; Petzoldt v. Commissioner, 92 T.C. 661, 695-696 (1989); Tokarski v. Commissioner, 87 T.C. at 77. Petitioners have the burden of proving that the unexplained bank deposits came from a nontaxable source. Calhoun v. United States, 591 F.2d at 1245; Ruark v. Commissioner, 449 F.2d at 312.

Petitioners contend that a nontaxable source of the unexplained bank deposits consists of cash sent to the Takaos from Akiko's mother in Japan. Petitioners assert further that another nontaxable source consists of a cash hoard that Akiko had accumulated before January 1, 1988, from cash the Takaos received between 1982 through 1987 from Akiko's parents, from interest income ($389,621) paid to the Takaos between 1982 and 1987, and from payments they received from the sales of the Silver Lake and

Sierra Lakes properties (according to petitioners over $314,000 in 1982 plus an additional $524,803 in later years).[13]

Respondent contends that Yoshinori's testimony regarding any nontaxable sources for the unexplained bank deposits was vague and inconsistent. Respondent maintains that Yoshinori failed to establish the amount the Takaos received between 1982 and 1987 from the alleged nontaxable sources. In addition, respondent asserts that Yoshinori has not established that the Takaos did not spend some or all of those funds or deposit them into their bank accounts during those years.

Except to the extent explained below, we agree with respondent that petitioners have not established a nontaxable source for the unexplained bank deposits.

Cash From Japan

Petitioners testified that during the years in issue Akiko brought back money from Japan, or received it in the mail from her mother, as repayment on a loan Akiko made to her parents in 1959. We have found that Akiko received $3,600 during each of

_____

[13] Without deciding at this time how much the Takaos actually received in installment sales payments from the Silver Lake and Sierra Lakes properties between 1982 and 1987, it appears that petitioners have miscalculated the total amount that the Takaos received from those sales by counting twice the $305,000 purportedly received in 1982. See table supra p. 18, which reflects that a total of $524,803 was received between 1982 and 1987 from installment payments from the two properties, including $305,000 received in 1982. The $524,803 total agrees with the amounts reported on the Takaos' tax returns for 1982 through 1987 as payments received from the Silver Lake and Sierra Lakes sales.

the years in issue in repayment for the loan. That amount is not taxable to the Takaos. Petitioners have not proved through testimony or other evidence that they received any cash from her mother above the $3,600 which we have allowed. Petitioners further have not proved that the Takaos brought into the United States from Japan any money other than money received for the repayment of the loan. Accordingly, the understatement of income is reduced $3,600 for each of the years in issue for loan repayments received from Akiko's mother.

Cash Hoard

Under the cash deposits method of determining unreported income, it is important to establish the amount of cash on hand at the beginning of the years in issue, because a large amount of undeposited cash could provide a likely source for the unexplained bank deposits. United States v. Soulard, 730 F.2d at 1298. Petitioners have the burden to establish the amount of any cash hoard accumulated before the beginning of the years in issue as well as the amount from that cash hoard that Akiko deposited during the years in issue. See Calhoun v. United States, supra.

Petitioners have not shown that the proceeds from the sales of properties, or interest income, or money from relatives received before January 1, 1988, were not deposited before that date. Conversely, there is evidence that one or both of the Takaos had deposited a significant amount of money in various bank accounts before that date. For example, a schedule of

income received between 1982 and 1987 admitted into evidence, see table supra p. 18, indicates that the Takaos received interest income from banks during that period of $306,499. Interest of that amount would suggest that the Takaos maintained a substantial principal balance in the banks during those years.

Yoshinori, Motomi, and Nakamura testified that Akiko maintained a cash hoard in her home before and during the years in issue as well as at the time of her death. However, none of them knew the amount of cash Akiko had on hand as of January 1, 1988, or the cash that remained at the end of the years in issue. They did not know whether any deposits Akiko made during the years in issue came from that cash hoard.

Yoshinori testified that Akiko began depositing money in 1988 after an employee of the bank advised Akiko she could earn interest on deposits. Petitioners also contend that Akiko made deposits from her cash hoard after Nakamura warned her in 1989 that it was dangerous to keep cash in the house. That testimony seems to be belied by the apparently large principal balances Akiko maintained in bank accounts before and during the years in issue. It also is contradicted by Motomi's testimony that Akiko had a large sum of money on hand at the time of her death. We do not doubt that Akiko kept some cash on hand in years before and during the years in issue. However, we are unable to find from this record the amount, if any, of the questioned cash deposits that came from cash accumulated before January 1, 1988.

Accordingly, petitioners have failed to prove Akiko's cash hoard constituted a nontaxable source for the unexplained bank deposits.

Specific Checks

Petitioners suggest in their brief that deposits from Motomi made during 1988, 1989, and 1990 were reimbursements for money Akiko gave her for purchases, that deposits from U.S.A. Publishing made in 1988 and 1989 were loan repayments made on a loan the Takaos made to that entity in 1982, that the deposit from California Physicians in 1990 was a refund for a medical payment, and that the deposit from Alameda County in 1991 was some type of refund. This Court does not consider statements in brief as proof. Rule 143(b); Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992); Viehweg v. Commissioner, 90 T.C. 1248, 1255 (1988); Evans v. Commissioner, 48 T.C. 704, 709 (1967), affd. per curiam 413 F.2d 1047 (9th Cir. 1969). Petitioners presented no evidence at trial in support of their contentions that the deposits were made for the reasons asserted. Accordingly, petitioners have not established that those deposits came from a nontaxable source.

Petitioners suggest on brief that the checks from Toraya Apartments deposited in 1988, 1990, and 1991 were rental income that was reported already on the Takaos' returns for those years. The record shows that Toraya Apartments was a partnership of which Nakamura was the managing general partner, and that the

partnership maintained its own checking account. The questioned checks are for the amounts of $5,200, $7,000, and $2,000 for 1988, 1990, and 1991, respectively. The Takaos reported passive losses of $2,696 and $2,310 from Toraya Apartments for 1988 and 1991, respectively, and passive income of $2,768 from Toraya Apartments for 1990. Neither Nakamura nor Yoshinori testified as to the nature of the disputed checks. We are not persuaded that the disputed checks from Toraya constitute rental income already included in income.

Petitioners speculate that the deposit in the amount of $1,000 from Toraya for 1988 was salary already reported in income. Yoshinori reported Form W-2 wages from Toraya for 1988 of $2,400, and Akiko reported Form W-2 wages from Toraya for 1988 of $5,275. Yoshinori did not testify regarding the nature of the $1,000 check from Toraya or about the manner in which Toraya paid his or Akiko's salary. Statements in briefs are not evidence. Rule 143(b); Niedringhaus v. Commissioner, supra; Viehweg v. Commissioner, supra; Evans v. Commissioner, supra. Under the circumstances, we are not persuaded that the $1,000 was included in income for 1988 as wages.

Petitioners contend that the $32,000 check from Nakamura deposited in 1990 was a loan and not income. Nakamura testified that he lent Yoshinori money in 1990. The record also contains a promissory note dated August 17, 1990, in which Yoshinori promises to pay Nakamura $32,000. On the basis of that evidence,

we find that the $32,000 check from Nakamura constituted a loan to Yoshinori; therefore, it was not taxable income to the Takaos.

### Other Unexplained Bank Deposits

Petitioners assert that the remaining deposits for which there is no explanation do not exceed reported income. Under the bank deposits method, generally bank deposits for the year are totaled and nontaxable amounts are eliminated. The balance constitutes a reconstructed gross income. Taxable income then is calculated in the usual way using the reconstructed gross income. If the resulting figure differs from the taxable income reported on the tax return for that year, the difference is presumed to constitute unreported taxable income. United States v. Hall, 650 F.2d at 997 n.4. We cannot ascertain from the record the total amount of bank deposits the Takaos made during each of the years in issue. Rather, for each year the parties refer to the amounts in issue as "unexplained deposits". Petitioners have not shown that the deposits in dispute represent total deposits for the years in issue. Consequently, we are not persuaded that the remaining deposits, in effect, are included already in reported income. Accordingly, with regard to the remaining unexplained bank deposits, except to the extent that any of the remaining unexplained bank deposits were included in respondent's concession in a stipulation of settled issues, we sustain respondent.

On the basis of the foregoing, we conclude that unexplained bank deposits in the following amounts constitute unreported taxable income to the Takaos for the following years:

|  | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| Unexplained deposits in issue | $110,644 | $61,800 | $114,934 | $37,277 |
| Less: | | | | |
| Money from parents | 3,600 | 3,600 | 3,600 | 3,600 |
| Check from Nakamura | -- | -- | -- | 32,000 |
| Unreported income from deposits | 107,044 | 58,200 | 111,334 | 1,677 |

### Cash Purchases

On November 23, 1988, Akiko used $9,000 cash to purchase a cashier's check.  On February 1, 1989, Yoshinori used $55,320 cash to purchase a Mercedes Benz.  On April 19, 1989, Akiko used $3,000 cash to purchase a traveler's check.  Respondent contends that the source of the cash to make those purchases for 1988 and 1989 was unreported income.  Petitioners contend that the Takaos used cash from Akiko's cash hoard to make the cash purchases.

Both Yoshinori and Nakamura testified that the cash for the purchase of the Mercedes Benz came from Akiko's cash hoard.  As we discussed above, although we do not doubt that Akiko maintained a cash hoard, the record does not establish the amount of cash on hand as of the beginning of the years in issue, or the amount that Akiko used from funds accumulated before that time.  Nevertheless, on the basis of the testimony relating to the purchase of the Mercedes Benz, we believe that at least some portion of the cash for the automobile came from cash accumulated

before January 1, 1988.  We find that $20,000 of the cash for the Mercedes Benz came from Akiko's cash hoard accumulated before the beginning of the years in issue; therefore, unreported income should be reduced accordingly.  With regard to the remaining unreported income from cash purchases, we sustain respondent.

Investment Interest Deduction

In the notices of deficiency respondent determined that the Takaos were not entitled to deductions for investment interest they claimed on Schedules A of their tax returns in the following amounts:

| Year | Amount |
|------|--------|
| 1988 | $49,299 |
| 1989 | 38,355 |
| 1990 | 30,000 |
| 1991 | 13,850 |

Petitioners contend that for each of the years in issue the Takaos are entitled to investment interest deductions for interest payments they made during those years on bona fide debts.  Respondent contends that petitioners have failed to establish that the Takaos paid interest to qualified creditors for those years.  Additionally, respondent contends that the Takaos did not have any qualified investment income against which any qualified investment interest expenses could be offset.

Section 163(a) provides the general rule that there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.  Limitations on that general rule,

however, may limit or prohibit a taxpayer from deducting indebtedness interest. Sec. 163. For example, section 163(h) provides that a taxpayer other than a corporation may not deduct personal interest.[14] Sec. 163(h). Excluded from the definition of personal interest is investment interest. Sec. 163(h)(2)(B).

---

[14] Sec. 163(h)(2) provides, in pertinent part, as follows:

(2) Personal interest.--For purposes of this subsection, the term "personal interest" means any interest allowable as a deduction under this chapter other than--

(A) interest paid or accrued on indebtednes properly allocable to a trade or business (other than the trade or business of performing services as an employee),

(B) any investment interest (within the meaning of subsection (d)),

(C) any interest which is taken into account under section 469 in computing income or loss from a passive activity of the taxpayer,

(D) any qualified residence interest (within the meaning of paragraph (3)), and

(E) any interest payable under section 6601 on any unpaid portion of the tax imposed by section 2001 for the period during which an extension of time for payment of such tax is in effect under section 6163 or 6166 or under section 6166A (as in effect before its repeal by the Economic Recovery Tax Act of 1981).

Investment interest is defined in section 163(d)(3) as follows:

> (3)  Investment interest.--For purposes of this subsection--
>
>> (A)  In general.--The term "investment interest" means any interest allowable as a deduction under this chapter (determined without regard to paragraph (1)) which is paid or accrued on indebtedness properly allocable to property held for investment.
>>
>> (B)  Exceptions.--The term "investment interest" shall not include--
>>
>>> (i)  any qualified residence interest (as defined in subsection (h)(3)), or
>>>
>>> (ii)  any interest which is taken into account under section 469 in computing income or loss from a passive activity of the taxpayer.
>>
>> (C)  Personal property used in short sale.--For purposes of this paragraph, the term "interest" includes any amount allowable as a deduction in connection with personal property used in a short sale.

Section 163(d) provides limitations on the amount of investment interest that is deductible in a year.  For years before 1987, the investment interest deduction is limited to net investment income[15] plus $10,000.  Over the years 1987 through

---

[15]  Sec. 163(d)(4) defines net investment interest as follows:

> (4)  Net investment income.--For purposes of this subsection--
>
>> (A)  In general.--The term "net investment income" means the excess of--
>>
>>> (i)  investment income, over

(continued...)

1990, the $10,000 in excess of net investment income is phased out. Sec. 163(d)(6). For years after 1990, the investment interest deduction is limited to the taxpayer's net investment income for the year. Sec. 163(d)(1). The amount of investment interest not deductible in a year is carried over to the next

---

[15](...continued)
            (ii)  investment expenses.

      (B)  Investment income.--The term "investment income" means the sum of--

            (i)  gross income (other than gain described in clause (ii)) from property held for investment, and

            (ii)  any net gain attributable to the disposition of property held for investment.

      (C)  Investment expenses.--The term "investment expenses" means the deductions allowed under this chapter (other than for interest) which are directly connected with the production of investment income.

      (D)  Income and expenses from passive activities.--Investment income and investment expenses shall not include any income or expenses taken into account under section 469 in computing income or loss from a passive activity.

      (E)  Reduction in investment income during phase-in of passive loss rules.--Investment income of the taxpayer for any taxable year shall be reduced by the amount of the passive activity loss to which section 469(a) does not apply for such taxable year by reason of section 469(m). The preceding sentence shall not apply to any portion of such passive activity loss which is attributable to a rental real estate activity with respect to which the taxpayer actively participates (within the meaning of section 469(i)(6)) during such taxable year.

year and treated as investment interest for that year.  Sec. 163(d)(2).

Section 163(d)(5)[16] defines property held for investment to include (i) property which normally produces income described in section 469(e)(1), and (ii) an interest in an activity involving the conduct of a trade or business which is not a passive activity and in which the taxpayer does not materially participate.  Sec. 163(d)(5); Russon v. Commissioner, 107 T.C. 263, 268-269 (1996).  Income described in section 469(e) includes

---

[16]  Sec. 163(d)(5) provides as follows:

    (5)  Property held for investment.--For purposes of this subsection--

        (A)  In general.--The term "property held for investment" shall include--

            (i) any property which produces income of a type described in section 469(e)(1), and

            (ii) any interest held by a taxpayer in an activity involving the conduct of a trade or business--

                (I) which is not a passive activity, and
                (II) with respect to which the taxpayer does not materially participate.

        (B)  Investment expenses.--In the case of property described in subparagraph (A)(i), expenses shall be allocated to such property in the same manner as under section 469.

        (C)  Terms.--For purposes of this paragraph, the terms "activity", "passive activity", and "materially participate" have the meanings given such terms by section 469.

"'interest, dividends, annuities, or royalties not derived in the ordinary course of a trade or business', sometimes known as portfolio income." Russon v. Commissioner, supra at 267 (quoting section 469(e)(1)).

Interest expense on a debt generally is allocated in the same manner as the debt to which the interest expense relates is allocated. Debt is allocated by tracing disbursements of the debt proceeds to specific expenditures. Seymour v. Commissioner, 109 T.C. 279, 282-283 (1997); Hickman v. Commissioner, T.C. Memo. 1997-545; sec. 1.163-8T(a)(3), Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987). Interest expense allocated to an investment expenditure is treated for purposes of section 163(d) as investment interest. Sec. 1.163-8T(a)(4)(i)(C), Temporary Income Tax Regs., 52 Fed. Reg. 25000 (July 2, 1987). The term "investment expenditure" means an expenditure (other than a passive activity expenditure) properly chargeable to capital account with respect to property held for investment within the meaning of section 163(d)(5)(A) or an expenditure in connection with the holding of the property. Sec. 1.163-8T(b)(3), Temporary Income Tax Regs., 52 Fed. Reg. 25000 (July 2, 1987). Debt is allocated to expenditures in accordance with the use of the debt proceeds. Sec. 1.163-8T(c)(1), Temporary Income Tax Regs., 52 Fed. Reg. 25000 (July 2, 1987).

1988 Investment Interest Deduction

For 1988, petitioners assert that the Takaos are entitled to an investment interest deduction in the amount of $49,299, for the accrued interest payment of $55,323.18 they made in 1988 on a loan Pier 29 made to Norager.  Petitioners maintain that the balance of the interest payment may be carried over to 1989.

Respondent contends that petitioners have not established that Yoshinori had any relationship to the "special account" from which Nakamura paid the $55,323.  Respondent contends further that petitioners have not shown that the Takaos owed any money to Pier 29.  Respondent additionally asserts that petitioners have failed to establish that the claimed interest constitutes investment interest.

It has long been established that for interest to be deductible under section 163(a), the interest must be on the indebtedness of the taxpayer and not the indebtedness of another. Borchert v. United States, 757 F.2d 209, 211 (8th Cir. 1985); Golder v. Commissioner, 604 F.2d 34, 35 (9th Cir. 1979), affg. T.C. Memo. 1976-150; Smith v. Commissioner, 84 T.C. 889, 897 (1985), affd. without published opinion 805 F.2d 1073 (D.C. Cir. 1986); Rushing v. Commissioner, 58 T.C. 996 (1972).  Nakamura presented conflicting testimony regarding who was liable on the note, Norager, a corporation, or Yoshinori and himself. Moreover, it appears that the assets acquired with the loan proceeds belonged to Norager, not to the Takaos.  Thus,

petitioners have failed to establish that the Takaos, who owned stock in Norager, were personally liable on the debt to Pier 29, or that they had an interest in the property during the years at issue.  Accordingly, we sustain respondent's determination on the investment interest issue for 1988.  In light of our holding, we do not address respondent's remaining arguments relating to this issue.

### 1989 Investment Interest Deduction

For 1989, petitioners claim that they are entitled to an investment interest deduction of $38,355, consisting of the carryover of investment interest from 1988[17] plus $30,000 interest Yoshinori paid to Nakamura on amounts Yoshinori owed Nakamura.  Nakamura testified that the $30,000 represented expenses he had incurred relating to an earlier audit that he had

---

[17]  In the Government's brief, respondent erroneously stated that the Takaos claimed an investment interest expense deduction of $55,320 on Schedule A--Itemized Deductions of their 1988 return.  The Form 4952, Investment Interest Expense Deduction, filed with the Takaos' 1988 return shows "Interest expense on investment debts paid or accrued" in 1988 in the amount of $55,320, "Allowed investment interest expense" in the amount of $49,299, and "Disallowed investment interest expense" in the amount of $6,021.  The Takaos reported "Deductible investment interest" in the amount of $49,299 on Schedule A for 1988.  The Form 4952 filed with the Takaos' 1989 return shows "Investment interest expense paid or accrued" in 1989 in the amount of $32,334, "Allowed investment interest expense" in the amount of $38,355, and "Disallowed investment interest expense" in the amount of zero.  The Takaos reported "Deductible investment interest" in the amount of $38,355 on Schedule A for 1989. Petitioners do not explain the $2,334 discrepancy in the amount of investment interest expense they claimed they paid in 1989 on Form 4952 ($32,334) and the amount they now claim in their brief ($30,000).  In light of our holding on the 1989 investment interest deduction, see infra, we do not resolve the discrepancy.

passed on to Yoshinori "because personal interest is not deductible." On the return he filed for 1989, Nakamura reported $30,000 in interest income from Yoshinori.

Respondent contends that petitioners did not establish that the Takaos had any loan obligations to anyone in 1989 that carried any interest obligations in the amounts claimed by the Takaos, or that the Takaos made any interest payments in that dollar amount during 1989. Respondent additionally asserts that petitioners have failed to establish that the claimed interest constitutes investment interest. Respondent also contends that the Takaos did not have investment income against which any investment interest expense may be deducted.

Petitioners presented no evidence showing that the Takaos used the loan proceeds to which the interest payments relate to acquire or hold property held for investment as defined in section 163(d)(5). Thus, they have failed in their burden of proof on this issue. Accordingly, we sustain respondent's determination for 1989. In light of our holding, we do not address respondent's remaining arguments relating to this issue.

1990 Investment Interest Deduction

For 1990, petitioners claim that the Takaos are entitled to an investment interest deduction of $30,000 for interest they paid to Nakamura on service charges and on a loan Nakamura made to Yoshinori in 1990 in order for Yoshinori to make a payment on

the loan from Hada.  On the return he filed for 1990, Nakamura reported $30,000 in interest income from Yoshinori.

Respondent contends that petitioners did not establish that the Takaos had any loan obligations to anyone in 1990 that carried any interest obligations in the amounts claimed by the Takaos, or that the Takaos made any interest payments in that dollar amount during 1990.  Respondent additionally asserts that petitioners have failed to establish that the claimed interest constitutes investment interest.  Respondent also contends that the Takaos did not have investment income against which any investment interest expense may be deducted.

Petitioners presented no evidence showing that the Takaos used the loan proceeds to which the interest relates to acquire or hold property held for investment as defined in section 163(d)(5).  Thus, they have failed in their burden of proof on this issue.  Accordingly, we sustain respondent's determination for 1990.  In light of our holding, we do not address respondent's remaining arguments relating to this issue.

1991 Investment Interest Deduction

For 1991, petitioners contend the Takaos are entitled to an investment interest deduction of $13,850 for imputed interest on the loan from Hada.

Respondent contends that petitioners have failed to establish that any payment was made to Hada during 1991 or that, if a payment was made, that the payment was not principal. Respondent additionally asserts that petitioners have failed to

establish that the claimed interest constitutes investment interest.  Respondent also contends that the Takaos did not have investment income against which any investment interest expense may be deducted.

Petitioners presented no evidence showing that the Takaos used the loan proceeds to which the interest relates to acquire or hold property held for investment as defined in section 163(d)(5).  Thus, they have failed in their burden of proof on this issue.  Accordingly, we sustain respondent's determination for 1991.  In light of our holding, we do not address respondent's remaining arguments relating to this issue.

We turn now to the additions to tax and penalties respondent determined for the years in issue.

## Section 6651(a)

Respondent determined that the Takaos are liable for an addition to tax for late filing under section 6651(a) for 1988, because they failed to timely file their Federal income tax return for that year.  Petitioners contend that the Takaos relied on Nakamura to timely file their return.  Respondent contends that the Takaos did not prove that the failure to timely file was due to reasonable cause.  We agree with respondent.

Section 6651(a)(1) imposes an addition to tax of 5 percent of the amount of the tax due for each month a return is delinquent, up to a maximum of 25 percent.  The addition to tax is not applicable if it is shown that the failure is due to reasonable cause and not willful neglect.  Sec. 6651(a)(1);

United States v. Boyle, 469 U.S. 241, 245 (1985).  Petitioners have the burden of proving that the failure to file was due to reasonable cause and not to willful neglect.  Niedringhaus v. Commissioner, 99 T.C. at 220-221; Baldwin v. Commissioner, 84 T.C. 859, 870 (1985).  To prove "reasonable cause", taxpayers must show that they exercised ordinary business care and prudence but nevertheless were unable to file the return within the statutorily prescribed time.  Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Generally, taxpayers may establish reasonable cause by proving that they reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return and later found that the advice was erroneous or mistaken.  United States v. Boyle, supra at 250; Estate of Paxton v. Commissioner, 86 T.C. 785, 820 (1986).  We have held that reasonable reliance on the erroneous advice of an attorney with respect to the due date of a return may constitute "reasonable cause" within the meaning of section 6651(a)(1).  Estate of La Meres v. Commissioner, 98 T.C. 294, 318 (1992).

The law is well settled, however, that "reliance on an agent to actually file the return, no matter how reasonable, will not, as a matter of law, constitute reasonable cause for a late filing under section 6651(a)(1)."  Id. at 314.  The Supreme Court made clear in United States v. Boyle, supra, that a taxpayer's reliance on an agent to perform a nondelegable duty is different

from a taxpayer's reliance on an expert's advice. Estate of La Meres v. Commissioner, supra at 314.

The record contains no explanation as to why the Takaos' 1988 return was not timely filed. Petitioners have not shown that the Takaos' failure to file timely returns was due to good faith reliance on Nakamura's erroneous advice, rather than reliance on him to perform their nondelegable duty to file that return. Petitioners have not satisfied their burden of proving that the Takaos had reasonable cause for not timely filing their 1988 return, and, accordingly, we sustain respondent's determination of the addition to tax under section 6651(a).

Sections 6653(a)(1) and 6662(a)

Respondent determined that the Takaos are liable for an addition to tax under for negligence under section 6653(a)(1) for 1988 and accuracy-related penalties for negligence under section 6662(a) for 1989, 1990, and 1991. Petitioners contend that the Takaos are not liable for the addition to tax or accuracy-related penalties for negligence, because they relied in good faith on Nakamura to prepare their tax returns properly for the years in issue. Respondent contends that petitioners failed to prove that the Takaos had reasonable cause for understating their income on their returns for 1988 through 1991, and that the understatements constitute negligence within the meaning of section 6653(a)(1) and section 6662(a)(1). We agree with respondent.

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the deficiency was due

to negligence or intentional disregard of rules or regulations. Section 6662(a) imposes a penalty in an amount equal to 20 percent of the underpayment of tax attributable to one or more of the items set forth in section 6662(b). Section 6662(b)(1) applies an accuracy-related penalty to the portion of an underpayment attributable to negligence or disregard of rules or regulations. Petitioners bear the burden of proving that respondent's determination is erroneous. Rule 142(a); Axelrod v. Commissioner, 56 T.C. at 258-259.

"Negligence" includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. Secs. 6653(a)(3), 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); Crocker v. Commissioner, 92 T.C. at 916; Neely v. Commissioner, 85 T.C. 934, 947-948 (1985); sec. 1.6662-3(b)(2), Income Tax Regs.

The Takaos' failure to maintain and to produce reliable records of their financial transactions and taxable income supports a conclusion of negligence. Crocker v. Commissioner, supra at 917; Schroeder v. Commissioner, 40 T.C. at 34. Moreover, they cannot avoid the addition to tax or penalty on the basis of reliance on their tax preparer, because they did not provide Nakamura with records or other information sufficient to prepare their returns accurately. Metra Chem. Corp. v. Commissioner, 88 T.C. 654, 662 (1987). The evidence justifies

imposition of the addition to tax or penalties for negligence for each year.

For 1988, we apply the addition to tax to the entire understatement of tax. Sec. 6653(a)(1). For years after 1988, the penalty applies only to the portion of the understatement attributable to negligence. Sec. 6662(a). For those years, petitioners did not prove that any of the adjustments conceded by the Takaos or decided by the Court in favor of respondent were not attributable to negligence. Accordingly, for 1989 through 1991, we apply the penalty to the entire understatement of tax.

Section 6661

Respondent determined that the Takaos are liable for an addition to tax for substantial underpayment of tax under section 6661 for 1988. Petitioners contend that the Takaos are not liable for the addition to tax under section 6661, because they relied in good faith on Nakamura to properly prepare their tax returns for the years in issue. Respondent contends that the Takaos are liable for the addition to tax under section 6661, because petitioners failed to prove that the Takaos (1) acted in good faith or had reasonable cause for the understatement of income on the 1988 return or (2) disclosed the understatement on their return for that year. We agree with respondent.

Section 6661 imposes an addition to tax of 25 percent of any underpayment attributable to a substantial understatement of tax.

Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498, 500-503 (1988). A substantial understatement of income tax is defined as an understatement of tax that exceeds the greater of 10 percent of the tax required to be shown on the return for the year or $5,000, whichever is greater. Sec. 6661(b)(1)(A). An understatement is the amount required to be shown on the return less the amount actually shown on the return. Sec. 6661(b)(2)(A). The Commissioner may waive the addition to tax if the taxpayer had reasonable cause for the understatement and acted in good faith. Sec. 6661(c). Petitioners bear the burden of proving that respondent's imposition of additions to tax under section 6661 is erroneous. Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 506 (1989).

Petitioners did not present any evidence at trial which would prove that the Takaos had reasonable cause for the understatement or that they acted in good faith in omitting the income from their 1988 return. Accordingly, we sustain respondent's determination as to the addition to tax under section 6661 for 1988.

Toraya

## Office Expenses Deduction

In the notice of deficiency for 1988 and 1989, respondent determined that Toraya was not entitled to deduct $9,733 and $12,000, respectively, for "Office Expenses" claimed on Toraya's returns for those years. In a stipulation of settled issues,

respondent conceded that Toraya is entitled to deduct $1,800 as "Office Expenses" for 1988.  The remaining adjustments for "Office Expenses" for 1988 and 1989 remain in issue.

Petitioners contend that for 1988 and 1989 Toraya is entitled to deduct as office expenses $7,933 and $12,000, respectively, that it paid to Motomi to reimburse her for expenses she incurred in establishing an office in her home at Nakamura's request.  Petitioners maintain that Motomi used the office, among other things, to reconcile waitress tags to cash register tapes and to count credit charge slips and record them on the daily sales registers.  Petitioners contend that the payments were not gifts to Motomi.  Petitioners assert that the payments served a business necessity and that Motomi would be taxable for the payments, unless she can establish that she may deduct her home office expenses on the Kudos' tax returns.

Respondent contends that petitioners have failed to substantiate that the payments to Motomi had a business purpose. Respondent asserts that petitioners did not establish the character and dollar amount of Motomi's alleged expenses, that reimbursement of those expenses was properly authorized by Toraya, that Motomi accounted for her expenses to Toraya, and that Motomi was required to work at home.  Thus, respondent maintains, petitioners have failed to establish that the claimed office expenses are deductible business expenses.  Respondent

contends further that no deduction of the expenses is permissible absent an accounting by Motomi of her expenses to Toraya.

Deductions are a matter of legislative grace, and petitioners must prove that Toraya is entitled to the claimed deductions.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934).  Section 162(a) provides a deduction for "ordinary and necessary" expenses paid or incurred during the taxable year in carrying on any trade or business.  To sustain their burden of proof, petitioners must establish that the claimed office expenses are "normal, usual or customary" in Toraya's trade or business and reasonable in relation to the purpose of that business.  Deputy v. duPont, 308 U.S. 488, 495 (1940); United States v. Haskel Engg. & Supply Co., 380 F.2d 786, 788-789 (9th Cir. 1967).  They must establish that the expenses bear "a proximate and direct relationship to the taxpayer's trade or business."  Carroll v. Commissioner, 51 T.C. 213, 218 (1968), affd. 418 F.2d 91 (7th Cir. 1969).  Furthermore, Toraya must keep sufficient records to establish deduction amounts.  Sec. 6001; Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965).

Motomi is the daughter of the Takaos, Toraya's sole shareholders.  Therefore, transactions between Motomi and Toraya should be closely scrutinized to ascertain whether payments to her by Toraya constitute bona fide business expenses which would be deductible under section 162.  See Harwood v. Commissioner, 82

T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); see also Schaefer v. Commissioner, T.C. Memo. 1994-444. Toraya has the burden of establishing that the payments to Motomi served a business purpose and were reasonable in amount.

Motomi testified that she maintained an office in her home to count credit card charges, to calculate the hours worked by Toraya's employees for preparing the payroll twice monthly, and, if she had time, to check the waitress tags to make sure they were added correctly. She stated that she recalled receiving money from Toraya to reimburse her for her office expenses, but she could not remember how much she received, when it was paid, or for which expenses she was reimbursed. Nakamura testified that Toraya's board of directors authorized him to reimburse Motomi for the expenses she incurred in establishing an office in her home in San Bruno, California. Nakamura stated that he considered the money paid to Motomi to be nontaxable to the Kudos because it was a reimbursement of her expenses.

Both Motomi and Nakamura testified that Toraya had agreed to reimburse Motomi for the expenses she incurred in maintaining an office in her home on Toraya's behalf. There is no evidence that Toraya agreed to compensate Motomi for her time or efforts in performing those activities. Consequently, Toraya must prove that the payments to Motomi reimbursed expenses she incurred on Toraya's behalf and that they were reasonable. The record,

however, lacks specificity as to the amounts Motomi incurred in 1988 and 1989 in performing business-related activities in her home on Toraya's behalf, or even as to how Toraya arrived at the amounts it paid to Motomi in those years. In our view, the amounts claimed appear excessive for the alleged purpose. Accordingly, Toraya has failed to prove that these payments to Motomi were business related and reasonable in amount.

Nonetheless, we are persuaded that Motomi performed some business-related activities pertaining to Toraya in her home and incurred some expense for that purpose. Under those circumstances we may make a reasonable estimate, bearing heavily against the taxpayer whose inexactitude is of his or her own making. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). We find that Toraya is entitled to deduct $520 for each of 1988 and 1989 for reimbursement of Motomi's expenses incurred in performing business-related activities in her home on Toraya's behalf.

Adjustments to Purchases Expense

In the notices of deficiency for 1988, 1989, 1990, and 1991, respondent reduced Toraya's "Purchases Expense" included in cost of goods sold for those years by $57,733, $36,131, $25,230, and $24,000, respectively, on the ground that Toraya had not established that the those amounts were for purchases or were paid during those years. Subsequently, in a stipulation of settled issues, respondent conceded that for 1988, 1989, 1990,

and 1991 those adjustments should be reduced by $30,733, $5,114, $25,230, and $24,000, respectively. Thus, for 1988 and 1989, $27,000 and $31,017, respectively, of the adjustments for "Purchases Expense" remain in issue.

### Payments to June and Junichi

Petitioners contend that for 1988 and 1989 Toraya is entitled to deduct $27,000 and $11,100, respectively, as "Purchases Expense" for payments made to Joan and Junichi. Petitioners claim that Nakamura wrote checks from Toraya's checking account payable to Joan and, after Joan left, payable to cash in order for Junichi to purchase food for the Berkeley restaurant. Petitioners assert that, even if Joan and Junichi had misused the money Toraya gave them to purchase food for the Berkeley restaurant, Toraya is entitled to the deduction. They contend that the payments to Joan and Junichi were not gifts or constructive dividends.

Respondent contends that the record does not establish that the payments to Joan and Junichi served a business purpose. Respondent asserts that petitioners did not prove that Joan performed any services relating to the Berkeley restaurant or that Junichi made any food purchases for the restaurant.

Junichi is the son and Joan is the daughter-in-law of the Takaos, Toraya's sole shareholders. Therefore, transactions between Junichi and Joan and Toraya should be closely scrutinized to ascertain whether payments to them by Toraya constitute bona

fide business expenses which would be deductible under section 162. See Harwood v. Commissioner, supra at 258; see also Schaefer v. Commissioner, supra. Toraya has the burden of establishing that the payments to Junichi and Joan served a business purpose and were reasonable in amount.

The record shows that during the years in issue it was Toraya's practice to give money to the restaurants' managers (Motomi in the case of the Post Street restaurant and Junichi in the case of the Berkeley restaurant) to purchase food and supplies for the restaurants. At trial, petitioners introduced checks payable to Joan in 1988 and 1989 totaling $24,300 and $7,100, respectively. Petitioners introduced additional checks payable to cash in 1989 and endorsed by Junichi totaling $4,000. Nakamura testified that Toraya gave these checks in order for Junichi to make cash purchases of food for the Berkeley restaurant. Five checks written to Joan in 1988, totaling $8,000, carried a notation indicating "purchases" or a derivation thereof on the memo line. One check written to Joan in 1989, totaling $1,100, carried the notation "Payroll" on the memo line. The other checks written to Joan had no notation on the memo line. The checks written to cash and endorsed by Junichi all had notations on the memo lines indicating that the checks were for produce. Neither Junichi nor Joan testified at trial.

We are persuaded that Junichi purchased food for the Berkeley restaurant. For 1988, petitioners submitted checks

totaling $24,300. We are not persuaded that Toraya paid Joan or Junichi more than that amount in 1988 for purchases for the Berkeley restaurant. For 1989, petitioners submitted checks totaling $11,100. Of those checks, we exclude from the amount deductible the check dated June 28, 1989, in the amount of $2,000, payable to cash and endorsed by Junichi. Nakamura testified that Joan left the California area in April 1989, and that Junichi was preparing to close down the Berkeley restaurant. The restaurant closed on June 30, 1989. We are not persuaded that Toraya give Junichi the $2,000 to purchase food for the restaurant. In addition, we exclude the check dated April 25, 1989, payable to Joan, in the amount of $1,100, and containing a notation indicating its purpose was "Payroll". We are not persuaded that the check was for food purchases or that that payment was not deducted as compensation. Accordingly, we hold that for 1988 and 1989 the allowable deductions for purchases by Joan and Junichi are $24,300 and $8,000, respectively.

Berkeley Restaurant Inventory

Petitioners contend that Toraya is entitled to write off for 1989, $19,917 as purchases for the Berkeley restaurant's inventory. Petitioners maintain that at the beginning of 1989 the Berkeley restaurant had an inventory balance of $19,917, and on June 30, 1989, when the restaurant was closed, it had an inventory balance of zero. Petitioners maintain that whatever inventory remained on hand when the restaurant closed its doors

was either discarded or transferred to the Post Street restaurant during 1989 and that Toraya is entitled to include the $19,917 as "Purchases Expense" for 1989.

Respondent contends that Toraya's writeoff of the Berkeley restaurant's inventory was improper. Respondent asserts that petitioners gave contradictory explanations as to what happened to the Berkeley restaurant's inventory when the restaurant closed--claiming both that it was abandoned and that it was transferred to the Post Street restaurant. Respondent maintains that, if the inventory was not abandoned, the Post Street restaurant's inventory should have been adjusted to show the addition of the Berkeley restaurant inventory. Petitioners counter that the Berkeley restaurant's inventory already was included in Toraya's opening inventory in its general ledger and, therefore, the Post Street restaurant's inventory did not need to be adjusted when the Berkeley restaurant was closed in 1989.

Gross income of a taxpayer who uses inventory is calculated by subtracting cost of goods sold from gross receipts. Molsen v. Commissioner, 85 T.C. 485, 498 (1985); sec. 1.61-3(a), Income Tax Regs. Cost of goods sold generally is calculated by subtracting inventory on hand at the end of the year from the sum of inventory on hand at the beginning of the year and the cost of any purchases made during the year. Molsen v. Commissioner, supra; see also sec. 1.162-1(a), Income Tax Regs.

Respondent does not challenge the value of the Berkeley restaurant's 1989 beginning inventory. Petitioners contend that Toraya combined the Berkeley restaurant's and the Post Street restaurant's beginning inventories in calculating its gross income for 1989. We have found that the Berkeley restaurant closed in June 1989, and that any usable inventory was transferred to the Post Street restaurant. Toraya would not be entitled to write off any of the Berkeley restaurant's inventory that remained on hand at yearend, because that inventory was not abandoned but was transferred to the Post Street restaurant and was includable in closing inventory for 1989. Toraya, however, would be entitled to claim as part of its cost of goods sold any of the Berkeley restaurant's 1989 beginning inventory that was used or abandoned during 1989. Accordingly, we hold that for 1989, in the Rule 155 computations, in calculating Toraya's cost of goods sold for the year, after taking into account any adjustments to Toraya's cost of goods sold for the year agreed to by the parties or decided by this Court, the Post Street restaurant's closing inventory should be subtracted from the sum of the Post Street and Berkeley restaurants' beginning inventory and the allowable purchases by the Post Street and Berkeley restaurants during 1989.

Unreported Income

Respondent determined that Toraya had unreported income, consisting of (1) unexplained cash deposits into the bank

accounts of the Takaos for 1988 through 1991, (2) certain cash purchases by the Takaos in 1988 and 1989, and (3) unexplained cash deposits into the bank accounts of the Kudos for 1990 and 1991.  Respondent concedes that cash deposits into the bank accounts of the Kudos in 1990 and 1991 in the amounts of $42,506 and $46,871 do not constitute gross receipts of Toraya for those years.  Additionally, we have decided, as discussed above in the section relating to unreported income of the Takaos, that $3,600 per year of the unexplained cash deposits by the Takaos came from the repayment of a loan by Akiko's parents and, thus, was not taxable to the Takaos.  We also decided, as discussed above, that during 1989 Akiko used $20,000 of a cash hoard accumulated before 1988 to purchase a car for Yoshinori and, thus, that amount also was not taxable to the Takaos.  It follows that those amounts are not  unreported receipts of Toraya.  Accordingly, unreported income of Toraya remaining in issue is as follows:

|  | Unreported income | | |
| Year | Per the notices of deficiency | Less respondent's concessions | Less amounts from nontaxable sources | Amount in issue |
|---|---|---|---|---|
| 1988 | $94,500 | -- | $3,600 | $90,900 |
| 1989 | 102,275 | -- | 23,600 | 78,675 |
| 1990 | 81,506 | $42,506 | 3,600 | 35,400 |
| 1991 | 58,271 | 46,871 | 3,600 | 7,800 |

Petitioners deny that Toraya had any unreported income for the years in issue.  Petitioners contend that the unexplained deposits into the Takaos' bank accounts did not come from the restaurants owned and operated by them or Toraya.  Petitioners

assert that it would have been impossible for those restaurants to generate the sales necessary to produce the amount of unreported income determined by respondent. Petitioners maintain that the restaurants' method of accounting for cash assured that all cash was accounted for and that there was no skimming of cash during the years in issue.

Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. at 77; see also United States v. Conaway, 11 F.3d 40, 43 (5th Cir. 1993) ("the evidence of bank deposits suffices to raise the inference that the taxpayer's income came from a taxable source"). We have decided above that the Takaos had unreported income as evidenced by unexplained bank deposits and cash purchases. Respondent need not prove a likely source of that unreported income. Petzoldt v. Commissioner, 92 T.C. at 695-696; Tokarski v. Commissioner, supra at 77. Here, however, a likely source exists in sales receipts of the restaurant owned by them and the restaurants owned by Toraya, of which the Takaos were the sole shareholders. Petitioners bear the burden of proving that Toraya did not underreport its income. Rule 142(a); Calhoun v. United States, 591 F.2d at 1245; Truesdell v. Commissioner, 89 T.C. 1280 (1987).

Petitioners presented expert testimony by John Shimmon (Shimmon) in support of their contention that the restaurants could not have unreported sales receipts. Shimmon stated that in the restaurant business the difference between cost of sales and

gross profit is the "purchase markup".  He indicated that in
California restaurants markups range from 125 percent to 225
percent, depending upon the quality of the restaurant, with
higher grade restaurants having higher percentage markups.
According to Shimmon, for a sales tax audit the California State
Board of Equalization uses a yardstick of a 100-percent markup on
food purchases to test the accuracy of total reported sales.  On
the basis of data from the income tax returns of Toraya and the
Takaos, Shimmon calculated the following purchase markups for
Toraya's restaurants and the Takaos' Fillmore Street restaurant
to be as follows:

| | Purchases Markup | |
| Year | Toraya | Fillmore St. |
| 1988 | 171% | 186% |
| 1989 | 179 | 178 |
| 1990 | 194 | 186 |
| 1991 | 219 | 173 |

Additionally, Shimmon stated that according to the Golden
Gate Restaurant Association, normal cash sales reported are only
30 percent of total sales.  For the restaurants in issue, Shimmon
calculated that their reported cash sales equaled the following
percentages of total reported sales:

| Year | Percentage |
| 1988 | 60% |
| 1989 | 64 |
| 1990 | 61 |
| 1991 | 61 |

Shimmon concluded that the restaurants' ratio of gross
profit to cost of sales and the restaurants' ratio of cash sales

to total sales show that the restaurants could not have had any unreported sales for the years in issue. The percentage markup figures upon which Shimmon relied represent an average of all grades of restaurants. Shimmon considered the restaurants in question to be medium-grade restaurants.

Respondent contends that petitioners have failed to establish that respondent's determination was erroneous. Respondent maintains that the source of the Takaos' unexplained cash deposits was unreported gross receipts from Toraya. Respondent argues that the Court should give little weight to Shimmon's testimony, because his conclusions were based on computerized records that are not in the record; thus, his calculations cannot be verified.

We weigh expert testimony in light of the expert's qualifications as well as all the other credible evidence in the record. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). We are not bound by the opinion of any expert witness, and we will accept or reject that expert testimony when, in our best judgment based on the record, it is appropriate to do so. Id.; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). While we may choose to accept the opinion of one expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may also be selective in the use of any portion of that opinion, Parker v. Commissioner, 86 T.C. 547, 562 (1986).

We are not persuaded by Shimmon's testimony that Toraya reported all of its gross receipts for the years in issue. Shimmon relied on a average range of markups based on all types and sizes of restaurants in arriving at his conclusion that Toraya accurately reported its sales receipts for the years in issue. It appears to us that many factors would affect the markup a specific restaurant could support, including type, size, and popularity. Toraya restaurants were sushi bar restaurants. The record does not indicate what a typical markup for that type of restaurant was during the years in issue. Shimmon rated the Toraya restaurants as medium grade. The record does not indicate the typical markup for that grade of restaurant. For the same reasons, we are not persuaded that Shimmon's comparison of cash sales to total sales is persuasive.

Additionally, Shimmon's calculations, based on the figures reported on the tax returns, show markups for each year in issue that are well in excess of the 100-percent markup yardstick that the California Board of Equalization used to test the accuracy of reported sales. Shimmon concluded that this result strongly supported a finding that the unexplained bank deposits did not arise from restaurant sales. In our view, however, the differential also demonstrates the hazard of relying on averages based on all types and sizes of restaurants in concluding that the income of a specific restaurant was or was not understated.

Moreover, in calculating the markup taking into account respondent's increase in gross receipts, Shimmon accepted as accurate the reductions to purchases expense determined by respondent on audit.  Following concessions by the parties and our decision relating to that issue, see supra, Shimmon's figures are no longer accurate.  Rather, after taking into consideration the adjustments to the unreported income and cost of goods sold determined by respondent as discussed supra, the restaurants' markups for the years in issue fall below the 225-percent top range used by Shimmon.[18]  Consequently, the adjusted purchases

---

[18]  Using totals for the two restaurants owned by Toraya and the one restaurant owned by the Takaos, the adjusted markups are computed as follows:

|  | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| Gross receipts per return | $1,286,571 | $997,067 | $810,958 | $740,860 |
| Unreported income | 90,900 | 78,675 | 35,400 | 7,800 |
| Adjusted gross receipts | 1,377,471 | 1,075,742 | 846,358 | 748,660 |
| Cost of goods sold per return | 467,757 | 357,634 | 279,183 | 249,129 |
| Adjustment to purchases | (3,000) | (3,100) | 6,000 | -- |
| Adjusted cost of goods sold | 464,757 | 354,534 | 285,183 | 249,129 |

(continued...)

markups do not support petitioners' contention that the restaurants could not have underreported their sales.

Only two of the three restaurants in issue during the years in issue were owned by Toraya. We are persuaded that some portion of the unreported income is attributable to the restaurants owned by Toraya and the balance is attributable to the restaurant owned by the Takaos. The portion attributable to the sole proprietorship would not be taxable to Toraya.

When we are convinced that some portion of alleged unreported income was, in fact, chargeable to the taxpayer, we may estimate the amount of the income even in the absence of precise records and testimony, bearing heavily upon the taxpayer who is responsible for the uncertainty. Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 744 (1973); see Llorente v. Commissioner, 74 T.C. 260, 268 (1980), affd. in part, revd. in part on other grounds and remanded 649 F.2d 152 (2d Cir. 1981).

Here, the restaurants all operated under the "Toraya" name, and they all served Japanese food. We find that the unreported income should be allocated to each restaurant on the basis of the

---

[18](...continued)

| | | | | |
|---|---|---|---|---|
| Adjusted gross profit | 912,714 | 721,208 | 561,175 | 499,531 |
| Purchases markup | 196% | 203% | 197% | 201% |

ratio of gross receipts of that restaurant to total gross receipts[19] of all restaurants.  Accordingly, for each year the unreported income in issue is allocable to the Toraya-operated restaurants and to the Fillmore Street restaurant as follows:

| Year | Toraya restaurants | Fillmore St. restaurant | Total unreported income |
|------|--------------------|-------------------------|-------------------------|
| 1988 | $65,175 | $25,725 | $90,900 |
| 1989 | 51,217 | 27,458 | 78,675 |
| 1990 | 19,612 | 15,788 | 35,400 |
| 1991 | 4,438 | 3,362 | 7,800 |

The unreported income attributable to the Toraya restaurants is taxable to it.

Petitioners' Alternative Positions

Petitioners contend, in the alternative, that Toraya, an accrual basis taxpayer, is entitled to deduct additional sales tax and California franchise taxes for the years in issue to the extent that its gross receipts are increased to reflect underreported income.  Respondent concedes that petitioners are entitled to the additional sales tax and California franchise tax deductions for the years in issue.  Accordingly, the additional deductions are to be included in the Rule 155 computations.

---

[19]

| Year | Total gross receipts | Gross receipts- Toraya | Percentage | Gross receipts- Fillmore St. | Percentage |
|------|----------------------|------------------------|------------|------------------------------|------------|
| 1988 | $1,286,571 | $922,439 | 71.7% | $364,132 | 28.3% |
| 1989 | 997,067 | 648,927 | 65.1% | 348,140 | 34.9% |
| 1990 | 810,958 | 449,608 | 55.4% | 361,350 | 44.6% |
| 1991 | 740,860 | 421,608 | 56.9% | 319,252 | 43.1% |

Petitioners further contend, in the alternative, that Toraya is entitled to a theft loss to the extent that its gross receipts are increased to reflect underreported income, because the cash was never deposited in Toraya's bank accounts and must have been unlawfully diverted before receipt by Toraya. Respondent contends that petitioners have presented no evidence to establish that Toraya is entitled to a theft loss for the gross receipts not deposited into Toraya's bank accounts but deposited into the Takaos' bank accounts or used by them. We agree with respondent. Accordingly, no deduction for theft losses relating to the unreported income is allowable.

We turn now to the additions to tax and penalties for the years in issue.

Section 6651(a)

Respondent determined that Toraya is liable for an addition to tax for late filing under section 6651(a) for 1988, because it failed to timely file its Federal income tax return for that year. Petitioners contend that Toraya relied on Nakamura to timely file its return. Respondent contends that Toraya did not prove that the failure to timely file was due to reasonable cause. We agree with respondent.

The record contains no explanation as to why Toraya's 1988 return was not timely filed. Petitioners have not shown that Toraya's failure to timely file its 1988 return was due to good faith reliance on Nakamura's erroneous advice rather than

reliance on him to perform Toraya's nondelegable duty to file that return.  United States v. Boyle, 469 U.S. at 245; Estate of La Meres v. Commissioner, 98 T.C. at 318.  Petitioners have not satisfied their burden of proving that Toraya had reasonable cause for not timely filing its 1988 return.  Niedringhaus v. Commissioner, 99 T.C. at 220-221; Baldwin v. Commissioner, 84 T.C. at 870.  Accordingly, we sustain respondent's determination of the addition to tax under section 6651(a) for 1988.

## Sections 6653(a)(1) and 6662(a)

Respondent determined that Toraya is liable for an addition to tax for negligence under section 6653(a)(1) for 1988 and accuracy-related penalties for negligence under section 6662(a) for 1989, 1990, and 1991.  Petitioners contend that Toraya is not liable for the addition to tax or accuracy-related penalties for negligence, because it relied in good faith on Nakamura to properly prepare its tax returns for the years in issue. Respondent contends that petitioners failed to prove that Toraya had reasonable cause for understating its income on its returns for 1988 through 1991 and that the understatements are due to negligence within the meaning of sections 6653(a)(1) and 6662(a)(1).  We agree with respondent.

Toraya's failure to maintain and to produce reliable records of its financial transactions and taxable income supports a conclusion of negligence.  Crocker v. Commissioner, 92 T.C. at 917; Schroeder v. Commissioner, 40 T.C. at 34.  Moreover, Toraya

cannot avoid the addition to tax or penalties on the basis of reliance on its tax preparer, because it did not provide Nakamura with the records or other information sufficient to prepare its returns accurately.  Metra Chem. Corp. v. Commissioner, 88 T.C. at 662.  The evidence justifies imposition of the addition to tax and penalties for negligence.

For 1988, we apply the addition to tax to the entire understatement of tax.  Sec. 6653(a)(1).  For years after 1988, the penalty applies only to the portion of the understatement attributable to negligence.  Sec. 6662(a).  For those years, petitioners did not prove that any of the adjustments conceded by Toraya or decided by the Court in favor of respondent were not attributable to negligence.  Accordingly, for 1989 through 1991, we apply the penalty for negligence to the entire understatement of tax for each year.

## Section 6661

Respondent determined that Toraya is liable for an addition to tax for substantial underpayment of tax under section 6661 for 1988.  Petitioners contend that Toraya is not liable for the addition to tax under section 6661, because it relied in good faith on Nakamura to properly prepare its tax returns for the years in issue.  Respondent contends that Toraya is liable for the addition to tax under section 6661, because petitioners failed to prove that Toraya (1) acted in good faith or had reasonable cause for the understatement of income on the 1988

return or (2) disclosed the understatement on its return for that year.  We agree with respondent.

Petitioners did not present any evidence at trial which would prove that Toraya had reasonable cause for the understatement or that it acted in good faith in omitting the income from its 1988 return or in overstating its deductions. Rule 142(a); Tweeddale v. Commissioner, 92 T.C. at 506. Accordingly, we sustain respondent's determination as to the addition to tax under section 6661 for 1988.

To reflect the foregoing and the concessions of the parties,

Decisions will be entered

under Rule 155.